**Virginia G. FOX, Appellant,**

v.

**Trey GRAYSON (In his Official Capacity as Secretary of State of the Commonwealth of Kentucky); Steven L. Beshear (In his Official Capacity as Governor of the Commonwealth of Kentucky); and Pam Miller, Appellees.**

No. 2009–SC–000066–TG.

Supreme Court of Kentucky.

April 22, 2010.

Rehearing Denied Aug. 26, 2010.

Paul Emmanuel Salamanca, Lexington, KY, Counsel for Appellant.

Angela C. Evans, Office of the Attorney General, Frankfort, KY, Counsel for Appellee Trey Grayson (In his Official Capacity as Secretary of State of the Commonwealth of Kentucky).

Ellen M. Hesen, General Counsel, Edmund Scott Sauer, Office of General Counsel, Office of the Governor, Frankfort, KY, Counsel for Appellee Steven L. Beshear (In his Official Capacity as Governor of the Commonwealth of Kentucky).

Dennis Lee Taulbee, Council on Postsecondary Education, Frankfort, KY, Counsel for Appellee Pam Miller.

Opinion of the Court by Chief Justice MINTON.

## I. INTRODUCTION.

In 1992, the voters approved amendments to § 93 of Kentucky's Constitution. The narrow question now before this Court is whether § 93, as amended in 1992, vests in the Kentucky State Senate alone the right to confirm appointees to so-called inferior state offices and nominees to boards and commissions. After careful consideration, we hold that § 93 of the Constitution, as amended, gives the Senate the sole right of confirmation.

## II. *FACTUAL AND PROCEDURAL HISTORY.*

In July 2007, Governor Ernie Fletcher appointed Virginia Fox to the Council on Postsecondary Education (CPE) for a term expiring December 31, 2012. Fox took her seat on the CPE immediately because the General Assembly was not in session at the time.[1] Before the next session of the General Assembly convened in January 2008, Steven L. Beshear replaced Fletcher as Governor of Kentucky.

During the 2008 regular session of the General Assembly, the Senate voted to confirm Fox's appointment to the CPE; but the House of Representatives failed to act on Fox's appointment before it adjourned *sine die*.[2] Because Fox was not confirmed timely by both legislative bodies as KRS 164.011(1) purports to require,[3] Governor Beshear's general counsel informed Fox that her seat on the CPE "has become vacant by operation of law." A few weeks later, Governor Beshear appointed Pam Miller to replace Fox on the CPE. Because the General Assembly was not in session at the time of her appointment, Miller took her seat on the CPE immediately.

Fox filed a declaratory judgment action in the Franklin Circuit Court against Miller; Governor Beshear, in his official capacity; and Trey Grayson, in his official capacity as Secretary of State of the Commonwealth of Kentucky. The heart of Fox's complaint was her contention that § 93 of the Kentucky Constitution vests the Senate with the sole power to confirm appointees such as she. For that reason, Fox argued, Miller's appointment was legally ineffective because Fox had already been duly confirmed by the Senate.

Secretary Grayson filed an answer in which he, essentially, took no position regarding the merits of Fox's complaint. Instead, Secretary Grayson asked to be relieved of any responsibility to file further responsive pleadings and to be designated as a nominal party. Governor Beshear, joined by Miller, however, took an active position against Fox's contentions, choosing—in lieu of an answer—to file a motion to dismiss under Kentucky Rules of Civil Procedure (CR) 12.02, arguing Fox's failure to state a claim upon which relief may be granted.[4] After briefing was completed, the trial court granted the Governor's motion to dismiss.

---

**1.** *See* Kentucky Revised Statutes (KRS) 11.160(2)(h) ("During periods when the General Assembly is not in session, the Governor's or other appointing authority's power of appointment shall not be diminished, and nominees may assume the responsibilities of the position pending confirmation. During that period, they shall be considered for all purposes to have been appointed and to be lawful occupants of the post to which they have been nominated, except that they shall be subject to the confirmation process when the General Assembly is next in regular session or special session called for the purpose of confirming the nominees.").

**2.** The Senate's vote to confirm Fox is, at least on its face, curious because KRS 11.160(2)(f) says, "[t]he confirmation shall originate in the House of Representatives. If the House of Representatives does not confirm an appoint-

ment, the Senate shall not consider the appointment." We take no position on whether the Senate's vote to confirm Fox was valid. That issue is not properly before us because it was not fully developed in the circuit court.

**3.** KRS 164.011(1) states, in relevant part, that "[t]he citizen members [of the CPE] shall be confirmed by the Senate and the House of Representatives under KRS 11.160...."

**4.** Miller joined Governor Beshear's CR 12.02 motion in the circuit court and has filed a brief with us simply stating that she agrees with the arguments contained in Governor Beshear's brief. So we shall simply use the shortened term "Governor" when referring to arguments advanced by both Governor Beshear and Miller.

Fox appealed that dismissal to the Kentucky Court of Appeals.[5] Because her appeal involves issues of great and immediate public importance, we granted Fox's unopposed motion to transfer her appeal to this Court. Now, having fully considered the well-presented arguments of the parties, as well as the applicable law, we conclude that Fox's assertion that § 93 of the Kentucky Constitution provides the Senate with the sole power to confirm gubernatorial appointments is correct. We reverse the trial court's order of dismissal and remand this case to Franklin Circuit Court for all necessary further proceedings.

## III. ANALYSIS.

### A. Section 93 and its Constitutional Predecessors.

In order to understand fully the current version of § 93, we must first examine its historical underpinnings. As the Governor notes, our first two state constitutions each indisputably conferred upon the Senate the exclusive authority to confirm gubernatorial appointments.[6] Our third constitution, adopted in 1850, however, did not so clearly provide the manner of appointment and confirmation of inferior state officers. Instead, Article III, § 25, of the 1850 Constitution merely provided that "inferior State officers, not specially provided for in this Constitution, may be appointed or elected in such manner as shall be prescribed by law...."[7]

Our current Kentucky Constitution, our Commonwealth's fourth, was adopted in 1891. As originally adopted, § 93 of our current Constitution provided, in relevant part, that "[i]nferior State officers, not specifically provided for in this Constitution, may be appointed or elected, in such manner as may be prescribed by law...." So, as originally adopted, § 93 was quite similar to its predecessor in the 1850 Constitution.

Section 93 remained unchanged for about a century, during which time the voters of the Commonwealth rejected three proposed amendments to it.[8] Then, in 1992, the General Assembly enacted SB 226,[9] which again placed—among other things—proposed amendments to § 93 be-

---

5. Apparently, in March 2009, before we granted transfer of Fox's appeal from the Court of Appeals, both the Senate and the House voted to confirm Miller as a member of the CPE.

6. Article II, § 8, of the 1792 Kentucky Constitution provided, in relevant part, that the Governor "shall nominate, and by and with the advice and consent of the Senate, appoint all officers, whose offices are established by this Constitution, or shall be established by law, and whose appointments are not herein otherwise provided for...." See http://courts. ky.gov/NR/rdonlyres/7471028C–8BCC–41A2– BA80–02013D4FA550/0/1stKYConstitution.pdf.

Likewise, Article III, § 9, of the 1799 Kentucky Constitution used the same language as the 1792 Kentucky Constitution. See http:// courts.ky.gov/NR/rdonlyres/E5470543–A249– 4265–8EDD–0C0DDD6A7212/0/2nd KYConstitution.pdf. (providing that the Gover-

nor "shall nominate, and by and with the advice and consent of the Senate, appoint all officers, whose offices are established by this Constitution, or shall be established by law, and whose appointments are not herein otherwise provided for....").

7. See http://courts.ky.gov/NR/rdonlyres/514E 219E–9A7A–4D29–A862–0C9BD00A3EC1/0/3rd KYConstitution.pdf.

8. The voters of the Commonwealth rejected proposed amendments to § 93 in 1972, 1980, and 1986. See Historical and Statutory Notes to § 93 (available at http://web2.westlaw.com/ find/default.wl?stid=#d6351998–82a0–403f–9 e7f–0b1f15cc2300'&ifm=NotSet&rp=%2 ffind®default.wl&sv=Split&rs=WLW10.02& cite=ky+const+93&fn=_top&mt= Kentucky&vr=2.0).

9. See 1992 Ky. Acts, Ch. 168 (S.B. 226), § 12.

fore the voters of the Commonwealth for their rejection or ratification.[10] Undoubtedly, the most well-known part of SB 226 was a clause permitting many statewide constitutional officers, most notably the Governor, to serve two consecutive terms. This case focuses upon a less heralded part of that bill that gives the Senate the express right to confirm nominees.

The voters approved the proposed constitutional amendments contained in SB 226.[11] So, after the amendments of 1992, § 93 reads as follows: [12]

> The Treasurer, Auditor of Public Accounts, Secretary of State, Commissioner of Agriculture, Labor and Statistics, *and* Attorney General, ~~Superintendent of Public Instruction and Register of the Land Office~~ shall be ineligible to re-election for the succeeding four years after the expiration of ~~the~~ *any second consecutive* term for which they shall have been elected. The duties and responsibilities of these officers shall be prescribed by law, and all fees collected by any of said officers shall be covered into the treasury. Inferior State officers *and members of boards and commissions,* not specifically provided for in this Constitution, may be appointed or elected, in such manner as may be prescribed by law, *which may include a requirement of consent by the Senate,* for a term not exceeding four years, and until their successors are appointed or elected and qualified.[13]

### B. Related Statutes.

Although the wording of § 93 is paramount in our analysis, we must also consider related statutes that have a direct bearing on this case.

We have already cited KRS 11.160(2)(h), which permitted Fox to take her seat on the CPE in the interim pending a confirmation vote. But we must also consider KRS 164.011(1), which describes the nomination procedure for members of the CPE. As originally enacted in 1992, that statutory subsection provided as follows:

> There shall be a Council on Higher Education in Kentucky, appointed for a term set by law pursuant to Section 23 of the Constitution of Kentucky. The council

---

**10.** *See* Ky. Const. § 256 ("Amendments to this Constitution may be proposed in either House of the General Assembly at a regular session, and if such amendment or amendments shall be agreed to by three-fifths of all the members elected to each House, such proposed amendment or amendments, with the yeas and nays of the members of each House taken thereon, shall be entered in full in their respective journals. Then such proposed amendment or amendments shall be submitted to the voters of the State for their ratification or rejection....").

**11.** Interestingly, although they approved the amendment at issue in the case at hand, the voters also rejected another proposed amendment to § 93 in 1992. *See* Historical and Statutory Notes to § 93 (available at *http://web2.westlaw.com/find/default.wl?stid=#d6351998–82a0–403f–9e7f–0b1f15cc2300'&ifm=NotSet&rp=®find®default.wl&sv=Split&51Frs=WLW10.02&cite=ky+*

*const+93&fn=_top&mt=Kentucky&vr=2.0).* The amendment rejected by the voters in 1992 would have, among other things, changed the offices of State Treasurer, Secretary of State, and Commissioner of Agriculture from elective to appointive offices. *See* 1992 Ky. Acts, Ch. 112, § 2 (S.B. 262). That defeated amendment also would have contained language providing that inferior state officers and members of boards and commissions could be appointed or elected in the manner prescribed by law, "which may include a requirement of consent by the Senate...." *Id.*

**12.** Additions to § 93 occasioned by the 1992 amendments are referenced in italics and deletions of the former language of § 93 occasioned by the 1992 amendments are referenced by strikethrough.

**13.** *See* 1992 Ky. Acts, Ch. 168 (S.B. 226), § 12.

shall be composed of the chief state school officer, and seventeen (17) lay members appointed by the Governor: one (1) from each Supreme Court district, ten (10) at large members which shall include a student member.[14]

In 1994, KRS 164.011 was amended in a manner not germane to this case. In 1997, however, KRS 164.011 was substantively amended to require members to be confirmed by both chambers of the General Assembly.[15] After the 1997 amendments, KRS 164.011(1) provides as follows: [16]

> There is hereby created and established a Council on Postsecondary Education in Kentucky as an agency, instrumentality, and political subdivision of the Commonwealth and a public body corporate and politic having all powers, duties, and responsibilities as are provided to it by law, appointed for a term set by law pursuant to Section 23 of the Constitution of Kentucky. The council shall be composed of the commissioner of education, a faculty member, a student member, and thirteen (13) citizen members appointed by the Governor. *The citizen members shall be confirmed by the Senate and the House of Representatives under KRS 11.160,* and the commissioner of education shall serve as a nonvoting ex officio member. Citizen council members shall be selected from a list of nominees provided to the Governor under the nominating process set forth in KRS 164.005. If the General Assembly is not in session at the time of the appointment, persons appointed shall serve prior to confirmation, but the Governor shall seek the consent of the General Assembly at the next regular session or at an intervening extraordi-

nary session if the matter is included in the call of the General Assembly. (Emphasis added.)

### C. *The Main Issue and the Standard of Review.*

KRS 164.011(1) clearly purports to require Fox to be confirmed by both chambers of the General Assembly. This bicameral confirmation requirement goes to the heart of Fox's complaint. Essentially, Fox argues that the bicameral confirmation requirement for members of the CPE contained in KRS 164.011(1) violates § 93 of the Kentucky Constitution. In Fox's view, § 93 permits only the Senate to confirm appointees. By contrast, the Governor contends the phrase in § 93 regarding confirmation by the Senate is merely illustrative of how appointees such as Fox could be confirmed; but the phrase was not meant to preclude confirmation by both chambers of the General Assembly. We agree with Fox.

Although the parties, oddly, do not focus upon it, the procedural stance of this appeal does not require us to determine as a matter of law whether Fox should prevail in her quest to regain her seat on the CPE. We see the question properly before us as far narrower: did the trial court err by granting the Governor's CR 12.02 motion to dismiss Fox's complaint for failure to state a claim upon which relief may be granted? In other words, our conclusion that § 93 prohibits bicameral confirmation does not end this case because little or no proof was adduced at the trial court level before the Governor filed his motion to dismiss; and Fox never filed a dispositive motion before the trial court. The Governor has not even filed an answer to Fox's

---

14. *See* 1992 Ky. Acts, Ch. 10 (H.B. 149), § 7.

15. *See* 1997 Ky. Acts, 1st Extra Sess., Ch. 1 (H.B. 1), § 73.

16. There have been no amendments to KRS 164.011 since 1997.

complaint. On remand, the Governor and Miller may raise whatever other defenses or legal reasons they believe preclude Fox from regaining her seat on the CPE; and Fox may present whatever evidence or legal arguments she deems necessary to convince the trial court to order her CPE seat to be restored to her.

 A motion to dismiss for failure to state a claim upon which relief may be granted "admits as true the material facts of the complaint."[17] So a court should not grant such a motion "unless it appears the pleading party would not be entitled to relief under any set of facts which could be proved. . . ."[18] Accordingly, "the pleadings should be liberally construed in the light most favorable to the plaintiff, all allegations being taken as true."[19] This exacting standard of review eliminates any need by the trial court to make findings of fact; "rather, the question is purely a matter of law. Stated another way, the court must ask if the facts alleged in the complaint can be proved, would the plaintiff be entitled to relief?"[20] Since a motion to dismiss for failure to state a claim upon which relief may be granted is a pure question of law, a reviewing court owes no deference to a trial court's determination; instead, an appellate court reviews the issue de novo.[21] Of course, in determining de novo whether Fox's complaint stated a claim upon which relief may be given, "we must give words [in the Kentucky Constitution] their plain and ordinary meanings."[22]

### D. *Plain Meaning of § 93.*

 The plain and ordinary meaning of "which may include a requirement of consent by the Senate" appears to be straightforward at first blush: the General Assembly may, in its discretion, choose to make inferior state officers and members of the various applicable state boards and commissions subject to a confirmation in the Senate. In other words, all the plain language of the pertinent part of § 93 seems to do is grant the Senate a right to confirm nominees. Conversely, there is nothing in the plain language of § 93 that

17. *Upchurch v. Clinton County,* 330 S.W.2d 428, 429–30 (Ky.1959).

18. *Pari–Mutuel Clerks' Union of Kentucky, Local 541, SEIU, AFL–CIO v. Kentucky Jockey Club,* 551 S.W.2d 801, 803 (Ky.1977).

19. *Morgan v. Bird,* 289 S.W.3d 222, 226 (Ky.App.2009).

20. *James v. Wilson,* 95 S.W.3d 875, 884 (Ky.App.2002).

21. *Morgan,* 289 S.W.3d at 226 ("It is well established that a court should not dismiss an action for failure to state a claim unless the pleading party appears not to be entitled to relief under any set of facts which could be proven in support of his claim. In ruling on a motion to dismiss, the pleadings should be liberally construed in the light most favorable to the plaintiff, all allegations being taken as true. Therefore, the question is purely a matter of law. Accordingly, the trial court's deci-

sion will be reviewed *de novo.*") (citations and internal quotation marks omitted).

Fox appended to her complaint various documents, such as letters, her resume, etc. CR 12.02 provides that a motion to dismiss under that rule shall be deemed to be a motion for summary judgment under CR 56 if "matters outside the pleading are presented to and not excluded by the court. . . ." The parties do not really address whether the documents attached to Fox's complaint converted the Governor's motion to a summary judgment motion under CR 56. We need not definitively resolve this issue because our conclusion would not be changed if we applied the summary judgment standard provided in CR 56.03 under which a party is entitled to summary judgment if there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

22. *Freeman v. St. Andrew Orthodox Church, Inc.,* 294 S.W.3d 425, 428 (Ky.2009).

permits the House to have any role in the confirmation vote. Undeniably, the House is not even mentioned in § 93. We cannot dismiss the notable omission of language specifically referencing the House as a mere accidental oversight. It is well settled law that a court may not add language to the written law to achieve a desired result.[23] And the conspicuous absence of any mention of the House having a role in the confirmation process could, therefore, be construed as a definite signal that there was no intent for that chamber to participate in the confirmation process.

An argument could be made that the plain language of § 93 evidences that nominees may only be subjected to confirmation by the Senate. Such a conclusion would be in accordance with the logic expressed by our country's most famous jurist, Chief Justice John Marshall, in his most famous opinion: "[a]ffirmative words are often, in their operation, negative of other objects than those affirmed...."[24] Likewise, another Chief Justice of the United States, William Howard Taft, used similar logic in interpreting a treaty: "[t]here certainly are no express words granting such [a construction]. Why should it be implied? If it was intended by the parties why should it not have been expressed?"[25]

Following that line of thought, one could ask: since there is no language even mentioning the House in § 93, how can a reviewing court imply that it exists? In other words, for the Governor's arguments to succeed, the clause of § 93 at issue should logically read, "which may include a requirement of consent by the Senate or House of Representatives."

When the Governor's arguments and citations to authority are fully considered, however, the superficial clarity of § 93 appreciably dims. In truth, close examination of the relevant language appears to reveal a latent ambiguity. So we must consider all of the relevant accompanying facts, circumstances, and laws, including the time-honored canons of construction, in order to interpret § 93 properly.

### E. Ambiguity and the Maxim of Interpretation Expressio Unius.

"It is a familiar and general rule of statutory construction that the mention of one thing implies the exclusion of another...."[26] This basic tenet of statutory construction is usually referred to by the Latin phrase *expressio unius est exclusio alterius*.[27] Often that maxim is shortened to expressio unius. Of course, like all canons of construction, *expressio unius* is not useful in every case. And we do not

---

**23.** *Cf. Beckham v. Board of Educ. of Jefferson County*, 873 S.W.2d 575, 577 (Ky.1994) ("We are not at liberty to add or subtract from the legislative enactment nor discover meaning not reasonably ascertainable from the language used."); *Mills v. City of Barbourville*, 273 Ky. 490, 117 S.W.2d 187, 188 (1938) ("The cardinal rule in construing statutes is, if possible, to ascertain the meaning of the Legislature from the language used, and if that be plain, clear, and unambiguous, resort to collateral rules of construction is unnecessary.").

**24.** *Marbury v. Madison*, 5 U.S. 137, 174, 1 Cranch 137, 2 L.Ed. 60 (1803).

**25.** *Ford v. United States*, 273 U.S. 593, 611, 47 S.Ct. 531, 71 L.Ed. 793 (1927).

**26.** *Jefferson County v. Gray*, 198 Ky. 600, 249 S.W. 771, 772 (1923).

The maxim may also be used to interpret or construe constitutional provisions. *See* 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 47:24 (7th ed. 2009) ("The maxim has been employed in the interpretation of constitutions....").

**27.** *See, e.g., Jefferson County*, 249 S.W. at 772 (using Latin phrase).

resort to canons of interpretation if the meaning of the law is clear.[28]

■ As explained, however, the relevant portion of § 93 is ambiguous, at least as applied to situations like the one at hand. So we will use *expressio unius*, but "only as an aid in arriving at [legislative] intention, and not to defeat it."[29] Because the *expressio unius* maxim is only a rule of construction, and not substantive law, we must use it only " 'when . . . that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference that that which is omitted must be intended to have opposite and contrary treatment.' "[30] In other words, *expressio unius* is most helpful when there is a strong, unmistakable contrast between what is expressed and what is omitted.

Use of the *expressio unius* maxim is particularly appropriate in this case because, even under an expansive reading of § 93, a very small number of possibilities exists—three, to be exact—regarding how the General Assembly may determine how appointees such as Fox may be confirmed.[31] First, § 93 could be construed to provide that the General Assembly may pass legislation providing that the Senate alone is vested with the power to confirm a particular type of appointee.[32] Second, § 93 could be interpreted to provide that the General Assembly could pass legislation providing that the House alone could be vested with the power to confirm a particular type of appointee.[33] Third, § 93 could be interpreted to provide that the General Assembly could pass legislation requiring both the Senate and the House each to confirm a particular type of appointee.

An unmistakable difference appears among those three possibilities. Use of one approach necessarily precludes use of one of the remaining two because a statute cannot, for example, provide in one section that an appointee should be confirmed by the Senate alone while stating somewhere else that that same appointee is subject to both House and Senate confirmation. The limited number of possible constructions of § 93 and the exclusivity and vast difference among the other possible constructions makes this case an ideal situation to apply the *expressio unius* maxim.

We recognize, as the Governor argues, the United States Supreme Court has held

---

28. *See, e.g., King Drugs, Inc. v. Commonwealth,* 250 S.W.3d 643, 645 (Ky.2008) ("Only if the statute is ambiguous, however, or otherwise frustrates a plain reading, do we resort to the canons or rules of construction. . . ."); 16 C.J.S. *Constitutional Law* § 62 (2009) ("Neither rules of construction nor rules of interpretation may be used to defeat the clear and certain meaning of a constitutional provision. . . . There is no occasion for construction where the language is plain and definite. . . .").

29. *Jefferson County,* 249 S.W. at 772.

30. *Union Light, Heat & Power Co. v. Louisville & N.R. Co.,* 257 Ky. 761, 79 S.W.2d 199, 202 (1935), *quoting Ford,* 273 U.S. at 611, 47 S.Ct. 531.

31. Of course, since not all appointed state employees must undergo the confirmation process, the three choices presuppose that the General Assembly has enacted legislation requiring the appointee in question to be confirmed to the position to which appointed.

32. There are several statutes that use this approach. Among those statutes are KRS 342.230(3) (workers' compensation administrative law judges); KRS 121.110(1) (members of Kentucky Registry of Election Finance); and KRS 131.315(1) (members of Kentucky Board of Tax Appeals).

33. We are aware of no statute employing this approach. But we agree with Fox's contention that the General Assembly would have the power to use that approach if we accepted the Governor's position.

that phrases such as "may include" are not well-suited to interpretation by use of *expressio unius* because the phrase "may include" is "expansive...."[34] But the differences between what was expressed and what was not were not as clear in the authorities relied upon by the Governor. The Supreme Court itself recognized that *expressio unius* was inapplicable in *Chevron USA, Inc.*, because, among other reasons, the range of possibilities if *expressio unius* were used was vast. In fact, the Court held that "that there is no apparent stopping point" if it applied *expressio unius* to the statute under construction.[35]

Likewise, our decision in *Cornelison v. Commonwealth,*[36] greatly relied upon by the Governor, is similarly distinguishable. In *Cornelison*, a defendant argued that error occurred when a police officer was permitted to testify during a sentencing hearing about the effect good-time credit would have on a potential sentence.[37] On appeal, Cornelison argued the officer's good-time-credit testimony was improper because KRS 532.055 listed several items of evidence that the Commonwealth could offer relevant to sentencing; but that statute did not mention good-time credit.

We rejected Cornelison's argument that the *expressio unius* maxim should apply, holding that "the list [in KRS 532.055] is illustrative rather than exhaustive."[38] But, as with *Chevron USA, Inc.*, our decision in *Cornelison* seems to have been at least partly based upon the potentially vast array of evidence that could properly be relevant to a sentencing determination. We held that good-time-credit-related evidence was "no less relevant nor more speculative than" another type of evidence listed in the statute.[39] In other words, the inclusion of types of evidence expressly deemed admissible by the statute did not lead to the logical conclusion that all other types of evidence were inadmissible, especially in light of the fact that one of the purposes of KRS 532.055 was to ensure a well-informed jury. In the case at hand, however, the list of potential, rational interpretations of § 93 is very short; and, accordingly, the inclusion of language permitting the Senate to confirm nominees leads to a strong presumption that the House was intentionally excluded from the confirmation process.

Also, *Chevron USA, Inc.*, relied upon by the Governor, is distinguishable because the Supreme Court found in that case that "language suggesting exclusiveness is missing" from the statute being construed (part of the Americans with Disabilities Act).[40] In the case at hand, since there are only, at most, three rational interpreta-

---

**34.** *Chevron USA, Inc. v. Echazabal*, 536 U.S. 73, 80, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002) ("Far from supporting Echazabal's position, the expansive phrasing of 'may include' points directly away from the sort of exclusive specification he claims.").

**35.** *Id.* at 83–84, 122 S.Ct. 2045 ("There is even a third strike against applying the expression-exclusion rule here. It is simply that there is no apparent stopping point to the argument that by specifying a threat-to-others defense Congress intended a negative implication about those whose safety could be considered. When Congress specified threats to others in the workplace, for example, could it possibly have meant that an employer could

not defend a refusal to hire when a worker's disability would threaten others outside the workplace? If Typhoid Mary had come under the ADA, would a meat packer have been defenseless if Mary had sued after being turned away?").

**36.** 990 S.W.2d 609 (Ky.1999).

**37.** *Id.* at 610.

**38.** *Id.*

**39.** *Id.* at 611.

**40.** 536 U.S. at 81, 122 S.Ct. 2045.

tions of the pertinent language of § 93, the express language setting forth one of those three possibilities gives rise to a strong presumption that the other two possibilities were intentionally excluded.

In short, the fact that there are only three rational, yet completely discrete, ways of interpreting the relevant language of § 93 means that the expression of one of those choices (confirmation by the Senate) carries great weight in implying that the other choices (confirmation by the House, either alone or acting along with the Senate) were intentionally excluded.

As one esteemed treatise on statutory construction notes, "[t]here is generally an inference that omissions are intentional. This rule is based on logic and common sense. It expresses the concept that when people say one thing they do not mean something else." [41] Another leading treatise agrees, stating, "the enumeration of certain specified things in a constitutional provision will usually be construed to exclude all things not enumerated." [42] We conclude, therefore, that the application of the *expressio unius* interpretive maxim works logically in this case and that the application of that maxim leads to a reasonable conclusion that the Senate alone has the constitutional confirmation power under § 93. We may not properly infer from utter silence a concomitant power for the House.

This conclusion does not end our inquiry because the Governor raises several arguments that he contends do, nevertheless, afford the House a role in the confirmation process even though that body is not expressly mentioned in § 93.

### F. *Historical Analysis of Confirmation Process.*

According to the Governor, the historical arc of the constitutional treatment of confirmation of state officers shows that the 1992 amendments were meant to depart from a Senate-only confirmation process. We disagree.

The Governor correctly points out that the framers of our 1891 Constitution rejected a proposed section that would have required all non-constitutionally mandated state officers to have been confirmed by the Senate. More specifically, the framers deleted a proposed section that would have provided, in relevant part, that the Governor "shall appoint, with the advice and consent of the Senate, all state officers who are not required by this Constitution, or the laws made thereunder, to be elected by the people." [43] The Governor argues that this deletion shows that "the framers of Kentucky's most recent constitutions have departed from a framework in which exclusive Senate confirmation is constitutionally required of all inferior state officers."

We are not convinced. The Governor is correct when he notes that the delegates to the 1890 Constitutional Convention did vote to delete a proposed constitutional section that would plainly have required senatorial confirmation of gubernatorial appointments.[44] But the Governor has pointed to nothing concrete that shows that deletion was aimed at allowing the House to have confirmation powers. Rather, as we have recognized in an earlier case, the section requiring senatorial confirmation was deleted only in order to permit the General Assembly to "deter-

---

**41.** 2A Singer & Singer, *supra,* § 47:25 (footnote omitted).

**42.** 16 C.J.S. Constitutional Law § 64 (2009).

**43.** *See* IV Official Report of the Proceedings and Debates in the Convention, 5728 (1890).

**44.** *Id.*

mine[ ] by legislative enactment [which inferior state officers] should be subject to such senate consent." [45]

As Delegate Charles J. Bronston of Fayette County pointed out to his fellow delegates in 1890, the section requiring senatorial confirmation of all appointees, which was later deleted, was originally intended only to permit the Governor to appoint the state Librarian.[46] The delegates instead wanted to retain the more general language of what ultimately became § 93 in order to allow the General Assembly to have flexibility in determining whether inferior state officers should be elected or appointed. As Delegate Bronston argued, requiring legislative confirmation of all appointees "would disturb that settled principle which, we believe, has been approved by the people, that as to all these subordinates, it should be left to the power of the General Assembly to say whether they should be elected or appointed. . . ."[47] So we disagree with the Governor's argument that the delegates to the 1890 Constitutional Convention clearly wanted to take the confirmation power from the Senate alone; instead, the official records of that Convention show that the delegates voted to delete the section requiring senatorial confirmation only to give the General Assembly flexibility in determining which inferior state officers must be subjected to confirmation at all.

We also do not agree with the Governor that the current version of § 93, as amended, reflects a conscious desire to move away from a Senate-only confirmation process. The language of § 93 belies such a construction.

Although when it was originally adopted, § 93 did not contain a clause directly pertaining to senatorial confirmation, the 1992 amendments to § 93 added the Senate-only confirmation language to our current constitution. So even if we assumed, solely for purposes of argument, that § 93, as originally adopted, did not vest the Senate with the exclusive right to confirm gubernatorial appointees, the 1992 amendments to § 93 were an unmistakable about-face from any purported retreat from Senate-only confirmation power. Since Fox convincingly argues that Kentucky has never in its constitutional history afforded the House confirmation powers, it logically follows that the framers of § 93 would have used clear language specifically permitting the House to have a role in the confirmation process if the framers had intended to enact such a sweeping change.

Perhaps the clearest indication that there was no intent for § 93, as originally enacted, to afford the House a role in the confirmation process is the General Assembly's enactment of legislation (since repealed) in 1893—hard on the heels of the adoption of the present Constitution—that provided, in relevant part, that "[u]nless otherwise provided, all persons appointed to an office by the Governor, whether to fill a vacancy, or as an original appointment, shall hold office, subject to the advice and consent of the Senate, which body shall take appropriate action upon such appointments at its first session held thereafter."[48] Nothing in that statute af-

---

**45.** *Kraus v. Kentucky State Senate,* 872 S.W.2d 433, 437 (Ky.1994).

**46.** *IV OFFICIAL REPORT OF THE PROCEEDINGS AND DEBATES IN THE CONVENTION* at 5728 ("We, of the Committee, were fully aware that at the time section 76 [requiring senatorial confirmation of all state officers] was adopted, it was thought important to allow the Governor to

appoint the Librarian. It was not understood at that time that the appointing power should be extended to any other official save that.").

**47.** *Id.*

**48.** *Sewell v. Bennett,* 187 Ky. 626, 220 S.W. 517, 519 (1920) (quoting former § 3750 of the

forded the House the right to confirm nominees. In reality, the opposite is true because the statute clearly contemplated confirmation only by the Senate.

### G. *The Word May.*

This desire to preserve the General Assembly's flexibility to determine which state officers must be subjected to the confirmation process also explains the use of the much-discussed word *may* in the 1992 amendments to § 93.[49] The Governor contends that since the word *may* is permissive and nonexclusive, the provision in § 93 providing that appointees *may* be subject to confirmation by the Senate is properly construed as being illustrative of how confirmation can occur. Although we agree with the Governor that *may* is generally a permissive term, we disagree that the use of that word in § 93 means that the House has the right to confirm appointees.

▮ Of course, as the Governor correctly points out, the word *may* generally signifies something as being permissive in nature in contrast to the word *shall*, which generally signifies something being mandatory.[50] It is also evident from the Constitutional Debates of 1890 that a proposed section of the Constitution requiring senatorial confirmation of all inferior state officers was deleted in favor of the more general language in § 93 (as originally enacted) in order to provide the General Assembly with as much leeway as possible to determine which state officers would be subject to senatorial confirmation.[51] The most logical conclusion, therefore, is that the term *may* in § 93 signifies only that the General Assembly has the permissive discretion to choose which gubernatorial appointees must be subjected to a confirmation.

In other words, absent some constitutional prohibition against doing so, appointees, like Fox, may be subject to confirmation if the General Assembly so directs, or appointees may be permitted to serve without ever having to be confirmed, if the General Assembly has not directed to the contrary. Either way is generally permissible under § 93. But we have not been shown evidence that the use of the term *may* in § 93 is evidence that the House has the constitutionally authorized ability to confirm nominees.

Indeed, the relative silence of our present Constitution, as originally enacted, regarding how (or if) appointees such as Fox would be confirmed led to *Kraus v. Kentucky State Senate*[52]—the court case that

---

Kentucky Statutes and noting that statute was passed in 1893).

**49.** As previously quoted, § 93 provides that inferior state officers and members of boards and commissions "may be appointed or elected, in such manner as may be prescribed by law, which may include a requirement of consent by the Senate...."

**50.** *See, e.g., Alexander v. S & M Motors, Inc.,* 28 S.W.3d 303, 305 (Ky.2000) ("Not only have Kentucky courts long construed 'may' to be a permissive word, rather than a mandatory word, but our legislature has given guidance in this regard. When considering the construction of statutes, KRS 446.010(20)

provides that 'may' is permissive, and 'shall' is mandatory.").

**51.** *See IV OFFICIAL REPORT OF THE PROCEEDINGS AND DEBATES IN THE CONVENTION* at 5728 (Delegate Bronston stating that the section requiring the Senate to confirm all gubernatorially appointed state officers should be deleted, among other reasons, because that mandatory confirmation section "would disturb that settled principle which, we believe, has been approved by the people, that as to all these subordinates, it should be left to the power of the General Assembly to say whether they should be elected or appointed....").

**52.** 872 S.W.2d 433.

likely was the impetus for the 1992 amendments to § 93.

### H. *Kraus v. Kentucky State Senate.*

As stated, § 93 of our current Constitution, as originally enacted, was silent on whether the Senate or even the House had the power to confirm inferior state officers. This constitutional silence resulted in a landmark decision from this Court.

In 1990, David Kraus was appointed to be an administrative law judge (ALJ) in the Kentucky Workers' Compensation system.[53] The Senate, however, rejected Kraus's nomination.[54] Kraus then filed an action challenging the constitutionality of the statute that granted the Senate the right to confirm nominees such as he. In 1991, the circuit court ruled that the statute was constitutional. Kraus appealed to the Court of Appeals.[55] Ultimately, late in 1992, the Court of Appeals affirmed the circuit court's decision. This Court granted discretionary review and eventually affirmed the Court of Appeals.

Kraus had argued on appeal, as the Governor argues in this case, that "the Senate does not have the authority to advise and consent because the [1890] constitutional convention amended and deleted mandatory 'advice and consent' language from Section 76 of the Constitution."[56] We ultimately rejected Kraus's argument, just as we now reject the Governor's argument in the case at hand, because the proposed mandatory confirmation language "had to be changed into the general terms which permitted Senate consent to any inferior state official that the General Assembly determined by legislative enactment should be subject to such [S]enate consent."[57] In other words, as stated before, the proposed mandatory confirmation language was deleted in 1890 in order for the General Assembly to preserve its discretion to determine precisely which inferior state officers—instead of all state officers—it wanted to be subjected to a confirmation vote.

This Court took definite note in *Kraus* of the fact that numerous statutes provide for executive appointment of state officers "subject to Senate and/or House approval."[58] And we relied in *Kraus* upon the fact that this Court or its predecessor had issued many decisions "acknowledg[ing] that the Senate has the power to consent to the appointment of inferior state officers."[59] So this Court rejected Kraus's arguments and affirmed the lower courts because we had reached a "conclusion that the Senate has the inherent power to advise and consent on executive branch appointments of inferior state officers."[60]

But during the length of the 1992 General Assembly's regular session, the separation of powers questions raised by Kraus awaited a final answer in the appellate courts. And it requires no blind leap of

---

53. Consistent with the law at the time, the appointment was made by the Workers' Compensation Board, not the governor. *Id.* at 435. Current law gives the governor the power to appoint Workers' Compensation ALJs, subject to the Senate's consent. *See* KRS 342.230(3).

54. *Kraus,* 872 S.W.2d at 435.

55. These timelines are available for public viewing by placing the correct identifying case information (*i.e.,* David Kraus as the name of the litigant) at the following website: *http://apps.courts.ky.gov/Appeals/COA_Dockets.shtm.*

56. 872 S.W.2d at 437.

57. *Id.* at 437.

58. *Id.*

59. *Id.*

60. *Id.* at 438.

faith to infer that securing the Senate's role in the confirmation process was the context from which some relevant part of SB 226 arose. This logical inference did not escape the Governor's notice in the case at hand: he mentions it in his brief.[61] So we agree with the Governor's conclusion that the relevant amendment to § 93 "was offered to prospectively settle ... [Kraus's] separation-of-powers question" and to "remove[ ] all doubt that the 'manner' of appointing inferior officers to be 'prescribed by law' 'may include a requirement of consent by the Senate.' "[62]

Acceptance of this premise, however, actually undermines the Governor's position in the case. If we accept the premise that the framers of the revisions to § 93 were motivated to amend the constitution to thwart Kraus's constitutional challenges, then the framers should only have logically been concerned with the Senate's power to confirm nominees because Kraus's lawsuit did not present any issue involving the House in the confirmation process because Kraus was not subject to confirmation in the House. In other words, the deliberate words chosen by the General Assembly in SB 226, which became the proposed amendments to § 93, reflected concern about senatorial confirmation rights because that was all that was at issue in *Kraus*. So the Governor's argument is unpersuasive to the extent that it relies upon the then-unresolved *Kraus* appeal to prove that the General Assembly intended the amendments to § 93 to permit the

House constitutionally a role in confirming executive appointments.

*Kraus* is important to the case at hand for reasons beyond supplying the historical context for SB 226 and the 1992 amendments to § 93. First, as previously discussed, our decision in *Kraus* provides compelling precedent for us to reject the Governor's argument that the constitutional convention's decision to delete proposed language requiring mandatory confirmation by the Senate for all appointees means that the House is constitutionally authorized to have a role in the confirmation process. Second, analysis of our decision in *Kraus* affords us the opportunity to correct some unfortunately imprecise language in that opinion. Specifically, we stated in a clause the Governor relies upon that "for more than the last one hundred years, the independent branches of government have recognized that *the General Assembly* has authority to confirm nominations from other branches of government."[63] To be accurate, what we should have said was that history shows that the Senate's right to confirm nominees has long been recognized.

Toward the beginning of our opinion, we noted that "the House is not involved in the confirmation process" for Kraus.[64] It is clear that the issue in Kraus involved only whether the Senate had the inherent authority to confirm (or reject) certain executive appointments. The question of whether the House was constitutionally permitted to play any role in confirming nominees such as Kraus was not at issue.

---

61. The Governor correctly notes that "[i]n 1992, during the litigation of the *Kraus* case discussed above, the General Assembly drafted, passed, and proposed an amendment to Section 93 of the Kentucky Constitution."

62. The wisdom of adding failsafe language to § 93 to preserve the Senate's right to confirm nominees is proven by the fact that this Court's decision upholding the Senate's inher-

ent right to confirm nominees such as Kraus was not a unanimous decision. *See* 872 S.W.2d at 440–41 (dissenting opinion of Justice Lambert, joined by Justice Combs).

63. *Id.* at 437 (emphasis added).

64. *Id.* at 435.

Even the first sentence of our opinion in Kraus says that "David L. Kraus challenges the authority *of the Kentucky State Senate* to grant to itself the power to consent to the employment . . . of an Administrative Law Judge . . . ." [65]

It is obvious, therefore, that we painted with too broad a brush in *Kraus* when we referred to a purported historical recognition of the General Assembly's authority to confirm nominees. To the contrary, Fox has ably and conclusively shown in this case that Kentucky's history provided for confirmation by the Senate alone.[66] So, in *Kraus*, we did not need to discuss what role the House could, or could not, play in confirming nominees.

Close scrutiny of our opinion in *Kraus* reveals that we did not intend to confer confirmation rights upon the House, our unfortunately broad language notwithstanding. Instead, when our opinion is examined carefully, it appears evident that we mentioned the House in *Kraus* in passing only to point out, without comment, that some statutes then-existing provided "for executive appointments subject to Senate and/or House approval." [67] We used imprecise language when we stated that other branches of Government have historically recognized *the General Assembly's* right to confirm nominees. To our knowledge, Fox's action is the first challenge to the recently enacted statutes purporting to give the House a role concomitant with the Senate's role in the confirmation process. The question of what role, if any, the House may permissibly

take in the confirmation process was not before us in *Kraus;* and nothing in that opinion should be interpreted to stand for a ruling by us that the House is constitutionally entitled to play a role in the confirmation process.

### I. *Contemporary Construction, Statutes Permitting the House to Perform a Role in the Confirmation Process, and the Ballot Question Prepared by the Secretary of State.*

As noted in our discussion of *Kraus*, there are several recent statutes that clearly afford the House a role equal to the Senate in the confirmation process. The Governor relies heavily upon those statutes to buttress his argument that § 93 was intended to—and actually does—afford the House a role in the confirmation process.

KRS 11.160, which provides the general framework for the confirmation of gubernatorial appointments, was first enacted in 1990. As originally enacted, it did not mention confirmation by the House.[68] In 1992, however, the General Assembly amended KRS 11.160 to specify the manner of confirmation of appointees who were statutorily required to be confirmed by both the House and the Senate.[69] The addition in 1992 of language pertaining to the House having a defined role in the confirmation of appointees was done in the same legislative session in which the General Assembly passed, and thereby pre-

---

**65.** *Id.* at 434 (emphasis added).

**66.** We have already quoted our former state constitutions that unequivocally authorized the Senate alone to confirm nominees, and we will not belabor this opinion with all the additional citations provided by Fox for this proposition. But suffice it to say that we generally agree with her assertion that Kentucky has a largely "unbroken practice . . . of

almost 200 years . . . of authorizing only the Senate to exercise a power of confirmation."

**67.** *Id.* at 437.

**68.** 1990 Ky. Acts, Ch. 505 (S.B. 176).

**69.** 1990 Ky. Acts, Ch. 415 (S.B. 107), § 1(2).

sented to the electorate, SB 226 and the amendments to § 93 at hand.

The Governor argues that this contemporaneous recognition of bicameral confirmation requirements in KRS 11.160 is entitled to great weight in interpreting the 1992 amendments to § 93. We agree, of course, that contemporaneous legislative explanation or clarification of a constitutional provision should ordinarily be given deference by a reviewing court.[70] But we disagree with the Governor's ultimate assertion that the enactment of statutes purporting to specify the manner of bicameral confirmation of appointees nullifies clear constitutional language to the contrary. Obviously, because "the constitution controls any legislative act repugnant to it[,]"[71] no statute can validly direct or authorize the performance of an unconstitutional act.[72]

It appears that there were at least two statutes requiring bicameral confirmation of gubernatorial nominees existing before the 1992 amendments to § 93. In 1990, for example, the General Assembly created the State Board for Elementary and Secondary Education.[73] The act creating that Board, currently codified at KRS 156.029, requires the eleven Board members to be appointed by the Governor and confirmed by both the Senate and the House.[74] Also, in 1990, as part of the same act that created this State Board for Elementary and

Educational Education, the General Assembly also created the Council for Education Technology.[75] The nine members of that Board were also required to be appointed by the Governor and confirmed by both the Senate and the House.[76] But in 1992, the General Assembly repealed the section of the KRS covering the Council for Education Technology.[77] In its place, the General Assembly created a new Council for Education Technology.[78] But that new Technology Council consisted of several *ex officio* members and eight members appointed by the Governor.[79] Notably, however, that bill did not require those eight appointed members to be confirmed by either the House or the Senate.

It is important to note that when those statutes providing for bicameral confirmation were enacted in 1990, the Constitution had not been amended to preclude the House from having a role in the confirmation process. Nor had the amendment to § 93 specifically giving the Senate alone the right to confirm nominees been ratified by the people when, in 1992, the General Assembly amended KRS 11.160(2) to specify the bicameral confirmation procedures.[80]

It is apparent that the General Assembly, the body that originally drafted the amendments to § 93 at issue, had already shown its ability and willingness to put specific language in legislation requiring

---

70. *See, e.g., Coleman v. Mulligan*, 234 Ky. 691, 28 S.W.2d 980, 981 (1930).

71. *Marbury*, 5 U.S. at 177.

72. *See, e.g., Commonwealth v. Barroso*, 122 S.W.3d 554, 558 (Ky.2003) ("As a general proposition, constitutional rights prevail over conflicting statutes and rules.").

73. Ky. Acts 1990, Ch. 476, Pt. II, § 35.

74. *Id.* KRS 156.029(1) still requires bicameral confirmation of Board members.

75. Ky. Acts 1990, Ch. 476, Pt. I, § 21.

76. *Id.*

77. Ky. Acts 1992, Ch. 195, § 15.

78. *Id.* at § 8.

79. *Id.*

80. Ky. Acts 1992, Ch. 415, § 1(2).

appointees to be confirmed by both the Senate and the House. Tellingly, however, the General Assembly chose not to put specific language in the relevant amendments to § 93 that would have required, or at least authorized, the House to confirm appointees.

We are unwilling to assume that the General Assembly omitted reference to the House in § 93 by oversight. Instead, we agree with Fox that the absence of language mentioning the House in § 93 should rationally be interpreted as a conscious decision by the General Assembly not to include the House in confirming nominees.

Although not memorialized in a statute, there are, in fact, some indicators that the contemporaneous construction of the 1992 amendments to § 93 envisioned only senatorial confirmation. First, the May 4, 1992, *Legislative Record,* a newspaper-style summary of Kentucky legislative activities edited and published by the Legislative Research Commission (LRC) (an entity charged with assisting the General Assembly), contains the steps that SB 226 took along the path to being enacted by both legislative chambers. That *Legislative Record* also contains a summary of SB 226. That summary states that one aspect of SB 226 was to "authorize appointment of members of boards and commissions with the consent of the Senate...." [81] The bill log for the House Committee on

Elections and Constitutional Amendments likewise summarizes SB 226, in pertinent part, as a proposal "to amend Section 93 to ... authorize appointment of members of boards and commissions with consent of the Senate...." [82] These are, therefore, at least two contemporaneous indications that the General Assembly contemplated only the Senate having the ability to confirm (or reject) appointments such as Fox's. [83]

Of course, the General Assembly has the ability to propose amendments to our Constitution; but those amendments must be ratified by the electorate. As our predecessor–Court memorably held, "[i]n the ultimate sense, the legislature does nothing unless and until the people ratify and choose to give the revised constitution life by their own direct action." [84] Indeed, § 256 of our Kentucky Constitution provides that after appropriate passage of a proposed amendment by the General Assembly, "such proposed amendment or amendments shall be submitted to the voters of the State for their ratification or rejection...." Obviously, therefore, the will of the people regarding constitutional amendments is paramount. Because the electorate has an inviolable right to be informed of all proposed constitutional amendments upon which it will pass judgment, § 257 of our Kentucky Constitution provides, in relevant part, that "[b]efore an

81. *Legislative Record,* May 4, 1992 (Vol. 20, No. 102, Regular Session), p. 37.

82. Neither the *Legislative Record* nor the bill log was provided to us by the parties. We may, however, properly sua sponte consider documents available to the general public. *See, e.g., Polley v. Allen,* 132 S.W.3d 223, 226 (Ky.App.2004) ("A court may properly take judicial notice of public records and government documents, including public records and government documents available from reliable sources on the internet."). These docu-

ments are available to the general public from the LRC upon request.

83. The LRC's website still summarizes the relevant portions of S.B. 226 as containing a proposal "to amend Section 93 to ... authorize appointment of members of boards and commissions with consent of the Senate...." *See http://www.lrc.ky.gov/recarch/92rs/bills/sb 226.htm.*

84. *Gatewood v. Matthews,* 403 S.W.2d 716, 720 (Ky.1966).

amendment shall be submitted to a vote, the Secretary of State shall cause such proposed amendment, and the time that the same is to be voted upon, to be published at least ninety days before the vote is to be taken thereon...."

Of great assistance to our determination of this matter is the actual question the Secretary of State directed the county clerks to place on the ballot in 1992. Since proposals to our Kentucky Constitution are "nothing" until a majority of the electorate gives the amendment "force and effect[,]"[85] what could be more critical to our decision than reading the actual question presented to the voters of Kentucky? So we granted Fox's request to supplement the record with a copy of the Secretary of State's official certification of the ballot question at hand.

In pertinent part, the ballot question presented to the voters[86] asked them whether they were in favor of "permitting the General Assembly to require *the Senate's consent* to the selection of inferior state officers and members of boards and commissions...." (Emphasis added.) Unlike previous proposed amendments that have spawned lawsuits challenging the form of the ballot question,[87] we have been cited to no actions, nor are we independently aware of any, that were filed to contest the sufficiency or accuracy of the ballot question in this case.

The question proposed to the voters plainly asked them whether they favored giving the Senate the express authority to consent to appointments. No reasonable voter could have construed that ballot question to mean that the House had any right whatsoever to confirm nominees. And, of course, since any constitutional provision "does not derive its force from the convention which framed it, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any ... abstruse meaning in the words employed...."[88] Instead, we must accept that the people, who, after all, were responsible for giving life to the constitutional provision, "accepted ... [its terms] in the sense most obvious to the common understanding, and ratified the instrument in the belief that was the sense designed to be conveyed. Accordingly, in construing a constitution, it is presumed that the language has been employed with sufficient precision to convey the intention...."[89]

Yet the Governor's construction of § 93 would logically authorize the House to have a role, either alone or in conjunction with the Senate, to confirm appointments such as Fox's even though there is no mention of any role for the House in either

---

**85.** *Gatewood,* 403 S.W.2d at 721.

**86.** Current law permits the General Assembly or the Attorney General to prepare a document stating the substance of the proposed constitutional amendment "in the form of a question in a manner calculated to inform the electorate of the substance of the amendment." KRS 118.415(1) & (2). The General Assembly did not grant to itself the power to create this ballot question for proposed constitutional amendments until 1994, however. Ky. Acts 1994, Ch. 461, § 1 (S.B. 185). We must presume, therefore, that the Attorney General prepared the 1992 ballot question at issue.

**87.** *See, e.g., Ferguson v. Redding,* 304 S.W.2d 927 (Ky.1957) (action challenging ballot question regarding proposed amendments to, among others, § 93); *Smith v. Hatcher,* 311 Ky. 386, 223 S.W.2d 182 (1949) (action challenging ballot question for proposed amendments to § 246); *Funk v. Fielder,* 243 S.W.2d 474 (1951) (action challenging ballot question for proposed amendment to § 256).

**88.** 16 C.J.S. CONSTITUTIONAL LAW § 59 (2009).

**89.** *Id.*

§ 93 itself or in the ballot question prepared by the Secretary of State. No voter reading the ballot question for the 1992 amendments to § 93 reasonably could have foreseen such a result.

We are aware that mainly since the 1992 amendments to § 93 were ratified, the General Assembly has enacted new statutes, or has amended existing statutes, to require certain nominees to be confirmed by both the House and the Senate.[90] But, as stated before, the intent of the people who ratified the constitutional provision must be considered the paramount consideration in constitutional interpretation.[91] And it has been conclusively shown that no reasonable voter would have believed that voter was authorizing bicameral confirmation (or confirmation by the House alone) by voting to approve the 1992 amendments to § 93. So the General Assembly's later attempts to require bicameral confirmation of certain appointees contravenes the will of the people, as unmistakably expressed by their approval of the amendments to § 93.

### J. Remand for Further Proceedings is Necessary.

■ For the reasons we have discussed at some length in this opinion, we agree with Fox that § 93 permits only the Senate to confirm nominees. So the bicameral confirmation requirement set forth in KRS 164.011(1) is invalid, even taking into account the presumption of constitutionality generally afforded to statutes.[92] This conclusion does not necessari-

ly mean, however, that Fox is entitled to return to her seat on the CPE.

As stated before, this case was early in the pleading stage when the trial court granted the Governor's motion to dismiss for failure to state a legally cognizable claim. Our conclusion that bicameral confirmation requirements in statutes such as KRS 164.011(1) are constitutionally infirm, however, leads to the inevitable conclusion that the trial court erred by dismissing Fox's complaint based upon its contrary interpretation of § 93. The ultimate merits of Fox's complaint, however, are an entirely separate matter, which the parties have not yet had a full opportunity to either prove or defend.

The only proper question before us is whether the trial court erred by dismissing Fox's complaint for failure to state a claim because of the purported bicameral confirmation requirement for members of the CPE. We have determined that the attempted bicameral confirmation requirement is contrary to § 93 of the Constitution of Kentucky. The merits of Fox's demand that she be restored to a place on the CPE were not fully presented to the trial court and, consequently, are not properly before this Court on appeal. Remand is necessary so that the parties may present their proof to advance or defend the ultimate merits of Fox's demand.

### IV. CONCLUSION.

We reverse the circuit court's order dismissing Virginia Fox's complaint for the reasons discussed in this opinion, and we

---

90. See, e.g., KRS 248.707(2)(b) (Agricultural Development Board); KRS 351.1041(2) (Mine Safety Review Commission); KRS 161.028(2)(b) (Education Professional Standards Board); KRS 164.005(1) (Governor's Postsecondary Education Nominating Committee); KRS 7B.030(1)(b)(2) (Kentucky Long–Term Policy Research Center).

91. 16 C.J.S. CONSTITUTIONAL LAW § 59 (2009).

92. See, e.g., Commonwealth v. Harrelson, 14 S.W.3d 541, 547 (Ky.2000) ("It is uncontroverted that a statute is presumed to be constitutional unless it clearly offends the limitations and prohibitions of the Constitution.").

remand the matter to the trial court for all necessary further proceedings.

All sitting. NOBLE, SCOTT, and VENTERS, JJ., concur.

ABRAMSON, J., concurs in result only by separate opinion.

CUNNINGHAM, J., dissents by separate opinion in which SCHRODER, J., joins.

SCHRODER, J., dissents by separate opinion in which CUNNINGHAM, J., joins.

ABRAMSON, J., concurring in result only.

I concur in result only and write separately to state a point of fundamental disagreement with the well-reasoned majority opinion. Specifically, I disagree with the following observation by the majority regarding how it came to pass that the confirmation provision in § 93, as amended in 1992, was confined to the Senate:

> We are unwilling to assume that the General Assembly omitted reference to the House in § 93 by oversight. Instead, we agree with Fox that the absence of language referencing the House in § 93 should rationally be interpreted as a conscious decision by the General Assembly not to include the House in confirming nominees.

Before, during and after the 1992 legislative session, the Kentucky General Assembly has passed legislation, which provides for bicameral confirmation of appointments to at least eight different boards and commissions. In my view, these laws reflect a clear, good faith belief on the part of the majority of both houses of the General Assembly that bicameral confirmation is constitutionally permissible. Unfortunately, given the plain wording of § 93, it is not. I firmly believe that the wording of § 93 was chosen to address the separation of powers issue raised, and eventually addressed by this Court, in *Kraus v. Kentucky State Senate*, 872 S.W.2d 433 (Ky.1994). In a classic case of focusing on the tree and forgetting to see the forest, SB 226 produced a constitutional amendment which specifically recognized the Senate confirmation provision at issue in *Kraus* but inadvertently undermined the bicameral confirmation provisions which had been deliberately included in prior legislation and which would continue to be included in laws relating to various boards and commissions in the years that followed.

The majority is correct that this Court must construe what it has before it and in § 93 we have language that does not admit a construction that is most likely what the General Assembly actually intended if their prior, contemporaneous and subsequent acts are considered. As for the idea that their intent has been rendered of secondary import, or even irrelevant, by the vote of the people, I cannot fully subscribe to that view. Notably, we have entrusted to the legislature the significant responsibility of initiating the constitutional amendment process. *Ky. Const.* § 256. As representatives of the people, their intent in proposing a constitutional amendment is vital and, therefore, it is equally vital that that intent be fully and painstakingly stated in any ballot question. If the overarching concept of the confirmation process, which in some instances is confined to the Senate but which in other instances has been shared by both houses of the Kentucky General Assembly, had been carefully considered in drafting the proposed amendment, I truly believe that we would not have been left with the "tree" that is now before us. We have been, however, and the language used in § 93 is so unambiguous that I can find no

defensible basis for looking beyond that clear language. Consequently, I must reluctantly concur in result.

CUNNINGHAM, J., dissenting.

With due respect, I dissent.

We are bound by law to adhere to a strong presumption of the constitutionality of statutes. Analysis begins with the presumption that legislative acts are constitutional. *Cain v. Lodestar Energy, Inc.,* 302 S.W.3d 39, 43 (Ky.2009) (footnote omitted). In my opinion, this presumption has been ignored in our holding that the "bicameral confirmation requirement" of KRS 164.011(1) is "constitutionally infirm."

Just last year, we addressed substantial deference given to upholding the constitutionality of statutes.

It is an axiomatic rule of statutory interpretation that when this Court considers the constitutionality of a statute, we must draw all fair and reasonable inferences in favor of upholding the validity of the statute. In Kentucky, a statute carries with it the presumption of constitutionality; therefore, when we consider it, "we are 'obligated to give it, if possible, an interpretation which upholds its constitutional validity.'" To the extent that there is reasonable doubt as to a statute's constitutionality, all presumptions will be in favor of upholding the statute, deferring to the "voice of the people as expressed through the legislative department of government." A constitutional infringement must be "clear, complete and unmistakable" in order to render the statute unconstitutional.

*Caneyville Volunteer Fire Dept. v. Green's Motorcycle Salvage, Inc.,* 286 S.W.3d 790, 806 (Ky.2009) (internal citations omitted).

I take major issue with the statement of the majority that "there is nothing in the plain language of § 93 that permits the House to have any role in the confirmation vote." That provision clearly authorizes both houses of the General Assembly to "prescribe by law" the method of Appellant's appointment to the Council on Postsecondary Education.

This section of the Kentucky Constitution plainly states that the office in question is to be appointed by the Governor "in such manner as may be prescribed by law." There is no ambiguity in those words. The provision simply broadens the representative involvement of the lawmaking body into the appointment process. There *is* ambiguity in the words "which may include a requirement of consent by the Senate." In fact, the majority spends page after page explaining what it means. In short, the majority gives minimal thrift to the precise and direct language of the constitutional provision and reverses this case on the ambiguous wording.

Our Court today gives hefty consideration to the fact that the voters of Kentucky approved this constitutional amendment and, therefore, must have endorsed Senate only confirmation. Says the Court, "No reasonable voter could have construed that ballot question to mean the House had any right whatsoever to confirm nominees." This requires a complete whiteout on the ballots throughout this state of the words "in such manner as may be prescribed by law." Of course, that was not the case.

In truth, when § 93 was on the ballot, it was all about the heart of the issue—authorizing the re-election of constitutional officers for one additional term. It is pure fantasy to think that the voters fully understood the last sentence we deal with here today when it has taken over a year of much consideration and discussion, and our Kentucky State Supreme Court almost forty pages, to tell us what it means.

In keeping with strong presumption of the constitutionality of statutes passed by our legislature, representing the citizenship of this state, I would affirm the decision below. Therefore, with deep appreciation for the five minds that differ, I respectfully dissent.

SCHRODER, J., joins.

SCHRODER, J., dissenting.

The bicameral confirmation requirement for members of the CPE contained in KRS 164.011(1) does not violate Section 93 of the Kentucky Constitution. The phrase in Section 93 regarding confirmation by the Senate is merely illustrative of how appointees could be confirmed. The phrase does not preclude a statute that requires confirmation by both chambers of the General Assembly. The language is clear; it says what it says.

CUNNINGHAM, J., joins.