RENDERED: APRIL 19, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0302-MR

BRENDA SHARPE                                                    APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v.            HONORABLE TRACY E. DAVIS, JUDGE
ACTION NO. 21-CI-006364

LAURA WALTERS, IN HER CAPACITY
AS EXECUTRIX OF THE ESTATE OF
JOHN A. SHARPE                                                  APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, JONES, AND KAREM, JUDGES.

JONES, JUDGE: Brenda Sharpe appeals a December 13, 2022, order of the

Jefferson Circuit Court dismissing her breach of contract claim against the above-

captioned appellee (hereinafter, the "Estate"). Upon review, we affirm.

# I. BACKGROUND

We limit our discussion of the background facts to those most pertinent to the issues directly before us.[1]  On November 9, 2021, Brenda filed suit in Jefferson Circuit Court against the Estate of her deceased husband, John Sharpe, for breach of contract.  The relevant allegations of her claim, following an amendment to her complaint, were as follows:

> 7. On or about May 19, 2017, Brenda Sharpe (then "Brenda J. Burton") and John A. Sharpe agreed to and signed a Prenuptial Agreement.
>
> 8. Brenda Sharpe and John A. Sharpe shared 401 Village Lake Drive as their residence.
>
> 9. John A. Sharpe promised, via the Prenuptial Agreement, that Brenda Sharpe "may remain in the residence for the rest of her life or until she should choose to move."
>
> 10. On or about August 18, 2021, Laura Walters was appointed as Executrix of John A. Sharpe's Estate in Jefferson District Court.
>
> 11. Following John A. Sharpe's death, Defendant, through counsel, informed Plaintiff that the Estate would not be honoring John A. Sharpe's contractual obligations under the Prenuptial Agreement.
>
> 12. On or about August 30, 2021, Laura Walters in her capacity as Executrix of John A. Sharpe's Estate, through counsel, informed Brenda Sharpe that the mortgage

---

[1] The parties were also involved in parallel probate proceedings that were appealed to the circuit court and ultimately consolidated with the underlying matter at that level.  The circuit court's disposition of that appeal is not at issue before this Court.

payments were no longer being made and that a foreclosure action was expected to be initiated soon.

13. Defendant informed Brenda Sharpe that she would not be permitted to remain in the residence for the rest of her life.

14. Laura Walters, in her capacity as Executrix of John A. Sharpe's Estate did stop making mortgage payments for 401 Village Lake Drive following John A. Sharpe's death.

15. Brenda Sharpe continued to pay for utilities, maintenance, and assessments as she promised under the Prenuptial Agreement.

. . .

22. Laura Walters, in her capacity as Executrix of John A. Sharpe's Estate, had a contractual obligation to provide Brenda Sharpe with the option to "remain in the residence for the rest of her life."

23. Defendant informed Brenda Sharpe, through counsel, that the Estate would not provide the option to remain in the residence unless Brenda Sharpe paid additional funds not referenced in the Prenuptial Agreement.

24. Laura Walters, in her capacity as Executrix of John A. Sharpe's Estate, breached the Estate's contractual duties when she informed the Plaintiff, through counsel, that the mortgage payments for 401 Village Lake Drive would no longer be made and that the property would go to foreclosure.

Brenda attached the two legal instruments referenced in her

allegations – John Sharpe's Will and the Prenuptial Agreement – as exhibits to her

complaint. Rather than answering, the Estate responded with a CR[2] 12.02 motion to dismiss, contending the Prenuptial Agreement did not support the thesis of Brenda's claim, *i.e.*, that it "breached" the Prenuptial Agreement by refusing to make the mortgage payments on 401 Village Lake Drive (hereinafter the "condo"). The circuit court ultimately agreed with the Estate and accordingly dismissed Brenda's claim. This appeal followed. Additional relevant facts will be discussed below in our analysis.

## II. STANDARD OF REVIEW

There appears to be some confusion as to the civil rule the circuit court effectively utilized in its order of dismissal, and the kind of arguments we are now at liberty to review in this appeal. Regarding the first point, the circuit court stated in the last order it entered below (*i.e.*, its February 14, 2023 order denying Brenda's motion for reconsideration) that because it had relied upon John Sharpe's Will and the Prenuptial Agreement in dismissing Brenda's claim, its dismissal had relied on "matters outside the pleading" and thus qualified as a "summary judgment." But that is incorrect. When a court considers matters outside the pleadings, a motion to dismiss is converted to a motion for summary judgment. *See* CR 12.02. However, when the "matters" in question are documents or exhibits central to the issues raised in a plaintiff's complaint and referenced therein, even if

---

[2] Kentucky Rule of Civil Procedure.

not incorporated by reference or attached to the complaint, "the records are subject to consideration without having to convert the motion under review to a summary judgment motion." *Netherwood v. Fifth Third Bank, Inc.*, 514 S.W.3d 558, 564 (Ky. App. 2017). Here, Brenda referenced John Sharpe's Will and the Prenuptial Agreement in her complaint; she attached those documents to her complaint as exhibits. Since the documents were part of Brenda's complaint the circuit court did not need to convert the motion to dismiss into one for summary judgment.

As to the second point, among the Estate's appellate arguments are its contentions that: (1) Brenda *falsely* alleged in paragraph 15 of her complaint that she "continued to pay for utilities, maintenance, and assessments as she promised under the Prenuptial Agreement"; and that (2) *res judicata* (based on the result of a forcible detainer action before a different court) and waiver (based on Brenda's purported abandonment of the condo) bar her breach of contract action. However, our standard of review does not permit us to assume the falsity of Brenda's allegations. Nor does it permit us to consider the Estate's contentions of *res judicata* or waiver, which are affirmative defenses not patently supported by the face of Brenda's complaint.

To be clear, our standard of review is as follows:

> A motion to dismiss for failure to state a claim upon which relief may be granted "admits as true the material facts of the complaint." *Fox v. Grayson*, 317 S.W.3d 1, 7 (Ky. 2010) (quoting *Upchurch v. Clinton*

*Cnty.*, 330 S.W.2d 428, 429-30 (Ky. 1959)).  The trial court should deny the motion "unless it appears the pleading party would not be entitled to relief under any set of facts which could be proved[.]"  *Pari-Mutuel Clerks' Union of Ky., Local 541 v. Ky. Jockey Club*, 551 S.W.2d 801, 803 (Ky. 1977).  Accordingly, "the pleadings should be liberally construed in the light most favorable to the plaintiff, all allegations being taken as true."  *Fox*, 317 S.W.3d at 7 (quoting *Morgan v. Bird*, 289 S.W.3d 222, 226 (Ky. App. 2009)).  This exacting standard of review means that the trial court is not required to make findings of fact; "'rather, the question is purely a matter of law.  Stated another way, the court must ask if the facts alleged in the complaint can be proved, would the plaintiff be entitled to relief?'"  *Fox*, 317 S.W.3d at 7 (quoting *James v. Wilson*, 95 S.W.3d 875, 884 (Ky. App. 2002)).  Since a motion to dismiss under CR 12.02 presents a pure question of law, "a reviewing court owes no deference to a trial court's determination; instead, an appellate court reviews the issue *de novo*."  *Fox*, 317 S.W.3d at 7.

*Browne v. Poole*, 680 S.W.3d 810, 812 (Ky. 2023).  Also pertinent to this appeal, we review *de novo* the circuit court's interpretation of wills, contracts, and other legal instruments.  *Benjamin v. JP Morgan Chase Bank, N.A.*, 305 S.W.3d 446, 451 (Ky. App. 2010) (citations omitted).

### III. ANALYSIS

We begin with a procedural issue.  The Estate asserts in its appellee brief that we should strike Brenda's appellate brief because, in violation of Kentucky Rules of Appellate Procedure ("RAP") 32(A)(3) and (4), her brief contains insufficient citations to the record supporting her factual allegations and

otherwise indicating that her appellate arguments are preserved. It is unnecessary to discuss this point in more depth, however, because in her subsequent reply brief Brenda responded to the Estate's motion by providing citations that we deem adequate. *See, e.g.*, *Hollingsworth v. Hollingsworth*, 798 S.W.2d 145, 147 (Ky. App. 1990) (explaining if the required citation is not included in the brief for appellant, the omission may be cured by providing the citation in the reply brief for appellant). Therefore, we decline to strike Brenda's brief.

We now proceed to the substance of this appeal. To demonstrate entitlement to relief on her claim, Brenda was required to establish: (1) the existence of a valid contract with John and his Estate; (2) a breach of that contract; and (3) that she sustained damages flowing from the breach of contract. *See Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007). As to the first of these elements, there is no dispute that Brenda entered into an enforceable contract[3] with John and binding upon his Estate on May 19,

_____

[3] While not contesting the validity of the Prenuptial Agreement, Brenda tangentially questions whether it could have effectively granted her a "life estate" because the Prenuptial Agreement does not qualify as a "deed" or (at least in her estimation) a "will." *See* Kentucky Revised Statute ("KRS") 382.010. However, the Prenuptial Agreement unquestionably fulfilled the legal requisites of KRS 394.540 and accordingly qualified as a "contract to make a . . . devise" pursuant to that statute. *See, e.g.*, *Herren v. Cochran*, 697 S.W.2d 149, 151 (Ky. App. 1985) (explaining parties validly executed and fully-performed antenuptial agreement, which provided the wife with a home for life and one-fourth of the husband's property in exchange for her release of dower rights, qualified as a contract to make a will and was enforceable against husband's estate). Thus, even if the parties validly executed and fully-performed Prenuptial Agreement did not operate to *convey* Brenda a life estate upon John's death, it at least imposed a contractual trust upon John's Estate in favor of Brenda representing her agreed-upon "life estate," enforceable through specific performance. *See Wides v. Wides' Ex'r*, 299 Ky. 103, 108-

2017.  In their agreement, Brenda and John expressed they were contemplating entering a contract of marriage and desired to settle their property rights in the event they did marry.  At issue are the following three provisions:

### 2. Principal Residence

At the time of this Agreement the parties are living together at 401 Village Lake Drive, Louisville, Kentucky, 40045, which is owned individually by [John[4]].  It is agreed that this property shall be the principal residence of [John] and Brenda during their marriage.  Should [John] predecease Brenda, it is specifically agreed that Brenda may remain in the residence for the rest of her life or until she should choose to move.  *Brenda shall be responsible to* [*sic*] *utilities, maintenance, assessments, and taxes during such period*.  Brenda's absence from the residence for sixty (60) consecutive days – other than for hospital or residential treatment – shall be deemed abandonment of the residence.  Except for *the life estate granted to Brenda herein*, the residence shall remain the sole property of [John] and shall become part of his estate upon death, free from any claim of the other party by inheritance, descent, dower, curtesy, or maintenance.

. . .

### 5. Separate Property and Descent

It is hereby mutually agreed by the parties that each have property, money, and credits of his or her own to which they must devote much personal attention, that each shall

---

09, 184 S.W.2d 579, 581-82 (1944).  In any event, the Estate has never contested Brenda's right to the "life estate" set forth in the agreement.

[4] The Prenuptial Agreement referred to John A. Sharpe by his nickname, "Jack."  For consistency and clarity, we have replaced each instance of "Jack" with "John."

retain absolute ownership of such property, money and credits of whatsoever kind and wheresoever located together with all rents, profits, and increases thereon as his or her separate property, and that *at no time shall either party have or claim any interest in any property, money or credit of the other*, whether or not any rents, profits, or increases thereon are a direct result of the personal efforts, skills, or services of the party owning them.  Upon the death of either party his or her separate property, money or credits shall pass to his or her children or their heirs, or as the parties may otherwise direct by Will, *unless otherwise specifically provided herein*.

**6. Release of Marital Rights**

Each party shall have no rights or interest in the separate property of the other brought to this marriage other than those interests specifically described herein, and each waives and releases all claims by inheritance, descent, dower, curtesy, maintenance or marital property rights in such separate property that he or she might otherwise have or obtain, and on the death of either party, the decedent's separate property shall pass by will or intestate succession to the decedent's heirs as if the marriage between the parties had never occurred, *except where otherwise specifically agreed herein*.

(Emphasis added.)

As indicated, the focus is upon the second element of Brenda's claim – whether this contract was breached.  According to Brenda, following John's death, all that was required of her to receive and continue enjoying the "life estate" contemplated in Paragraph 2 of the Prenuptial Agreement was her payment of "utilities, maintenance, assessments, and taxes during such period."  She notes the

Prenuptial Agreement does not explicitly specify that she would also be liable for paying all or part of any outstanding loan, secured by a mortgage on the condo, that John may have taken prior to his death. She also notes that nonpayment of that loan could result in foreclosure proceedings and effectively eviscerate her "life estate." As such, she reasons, the Prenuptial Agreement rendered John's Estate liable for the mortgage payments to preserve her life estate; and the Estate accordingly breached the Prenuptial Agreement by refusing to make those payments.

Conversely, however, nothing in the Prenuptial Agreement explicitly specifies John or his Estate were required to make those mortgage payments, either. The Prenuptial Agreement is wholly silent regarding the mortgage. Moreover, the Prenuptial Agreement did not explicitly prohibit John, by and through his undisputedly valid last will and testament, from – as here – devising the condo to his children but directing his estate *not* to pay the mortgage. And that, in turn, leads to the legal underpinning of Brenda's claim of breach: In her view, an *implied* covenant in the Prenuptial Agreement required the Estate to make the mortgage payments. Seizing upon the doctrine of "*expressio unius est exclusio alterius*" (*e.g.*, "that the mention of one thing implies the exclusion of another"[5]), Brenda contends that because the Prenuptial Agreement listed "utilities,

---

[5] *Jefferson County v. Gray*, 198 Ky. 600, 249 S.W. 771, 772 (1923).

maintenance, assessments, and taxes" as her responsibility during her life tenancy, but omitted "mortgages" from that list, it should be implied that the parties intended and contracted for the Estate, and not her, to pay the mortgage.

We disagree. The applicable law regarding implied covenants is as follows:

> An implied covenant is one which may reasonably be inferred from the whole agreement and the circumstances attending its execution. A covenant is viewed as implied in nature when its existence is inferred by legal construction from the use of certain words and phrases. There is no limitation upon the form or general character of the words which may lay the basis for the existence of an implied covenant. The primary concern in this connection is the intention of the parties to the instrument rather than the manner of its expression. However, implied covenants are not favored in the law. Such covenants can arise only where is no expression on the subject. The courts will declare implied covenants to exist only when there is a satisfactory basis in the express contract of the parties which makes it necessary to imply certain duties and obligations in order to [a]ffect the purposes of the parties to the contract made. Such covenants can be justified only upon the ground of legal necessity arising from the terms of a contract or the substance thereof. The implication from the words must be such as will clearly authorize the inference or an imputation in law of the creation of a covenant. It is not enough to say that it is necessary to make the contract fair, that it ought to have contained a stipulation which is not found in it, or that without such covenant it would be improvident, unwise, or operate unjustly. The covenants raised by law from the use of particular words in an instrument are only intended to be operative when the parties themselves have omitted to insert covenants. But when a party clearly indicates to what extent he intends

-11-

> to warrant or obligate himself, that is the limit of his covenant and the law will not hold him beyond it. 14 Am.Jur., Covenants, Section 14, page 490.

*Anderson v. Britt*, 375 S.W.2d 258, 260-61 (Ky. 1963).

The doctrine of *expressio unius est exclusio alterius* is merely a rule of construction, not substantive law, and it merely assists in arriving at intent, not defeating it. *See Fox*, 317 S.W.3d at 9. "[W]e must use it only when . . . that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference that that which is omitted must be intended to have opposite and contrary treatment." *Id*. (internal quotation marks and citation omitted). With that said, applying it here to achieve the result urged by Brenda would defeat the intention of the Prenuptial Agreement because it would repeal by implication the language emphasized above in Paragraphs 5 and 6 of the Prenuptial Agreement: It would effectively give Brenda the contractual right to force John's Estate to expend its funds for her benefit – a right not "otherwise specifically provided" by or "agreed" to in the Prenuptial Agreement.

Moreover, providing Brenda an unencumbered life estate is not "necessary . . . in order to effect the purposes of the parties to the contract made." *Anderson*, 375 S.W.2d at 261. The Prenuptial Agreement did not specify that Brenda's life estate in the condo would be unencumbered; no legal authority prevented John or his Estate from granting Brenda a life estate in otherwise

encumbered property; thus, it is not "necessary to imply" that John or his Estate had a duty or obligation to pay all or any portion of the mortgage. *Id.*

As for what the parties intended by granting Brenda a "life estate" through the Prenuptial Agreement, that phrase is a legal term of art; Brenda and John are presumed to have known the law at the time they made their agreement; and, "[i]t is an accepted principle that included in the terms of contracts are the laws which subsist at the time and place of the making of the contract, and where it is to be performed, as if they were expressly incorporated in its terms[.]" *City of Covington v. Sanitation Dist. No. 1 of Campbell and Kenton Counties*, 301 S.W.2d 885, 888 (Ky. 1957).

With respect to "life estates" in Kentucky, the law provides that the life tenant has a duty to maintain and manage the estate for the benefit of the remaindermen. *See Adams v. Adams*, 371 S.W.2d 637, 638 (Ky. 1963). To that end, the life tenant is generally bound to pay taxes, maintain insurance, and make repairs and improvements, and cannot charge them against the remaindermen. *Id.* Included with this duty is also the obligation "to pay interest on an indebtedness against the estate" during the tenure of the life tenancy. *Stavros v. Bradley*, 313 Ky. 676, 680, 232 S.W.2d 1004, 1006 (1950) (citation omitted). Consequently, absent an explicit condition to the contrary, the life tenant must pay the interest on an outstanding mortgage obligation "at least to the extent of the income or rental

-13-

value of the property." *Todd's Ex'r v. First Nat. Bank*, 173 Ky. 60, 190 S.W. 468, 471 (1917) (citations omitted). Furthermore, the life tenant has no unqualified right to compel the devisees of the remainder interest to pay a share of a preexisting mortgage on real property they have all respectively inherited; a life tenant merely has a right of subrogation that only comes into being after he or she pays the remaindermen's properly apportioned share of the principal debt. *Id*.; *see also Parrish v. Ross*, 103 Ky. 33, 44 S.W. 134, 135 (1898).

Accordingly, the law which subsisted at the time and place of the making of the Prenuptial Agreement, which was presumptively included in its terms, gave Brenda no *contractual* right to compel the Estate or John's children (*e.g.*, the remaindermen under the circumstances) to pay the mortgage. At most, it provided Brenda only an *equitable* right of reimbursement to the extent that she paid any portion of their share of it. There is no allegation in Brenda's complaint that she paid any portion of their share and, indeed, the theory of Brenda's claim was that the Estate breached the Prenuptial Agreement by failing to pay the mortgage in its entirety.

In sum, Brenda's assertion that the Prenuptial Agreement implicitly required the Estate to pay the outstanding mortgage lacks merit because any such covenant was: (1) disfavored in the law; (2) unnecessary to effectuate the agreement; and (3) contrary to the parties' intent – as expressed by the entirety of

-14-

their agreement's language, as well as by what they were presumed to know according to the existing law. Taken in that light, and boiled to its essence, Brenda's claim against the Estate is simply that the Estate should pay the mortgage because "it is necessary to make the contract fair, that it ought to have contained a stipulation which is not found in it, or that without such covenant it would be improvident, unwise, or operate unjustly[.]" *Anderson*, 375 S.W.2d at 261. For purposes of a claim alleging the breach of an implied covenant, that is not enough. *Id*.

## IV. CONCLUSION

Considering the foregoing, we AFFIRM.


ALL CONCUR.


BRIEFS FOR APPELLANT:

Daniel H. Schoenbaechler
Louisville, Kentucky

BRIEF FOR APPELLEE:

David B. Mour
Louisville, Kentucky