RENDERED: APRIL 24, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0018-DG

ERIE INSURANCE EXCHANGE        APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.       NO. 2022-CA-1405
FLOYD CIRCUIT COURT NO. 19-CI-00059

MEGAN JOHNSON; TERRI REED; AND       APPELLEES
SHANE HALL, ATTORNEY AT LAW, PLLC

**OPINION OF THE COURT BY JUSTICE THOMPSON**

**AFFIRMING IN PART, REVERSING IN PART, AND REMANDING**

In 1974, the General Assembly enacted the Motor Vehicle Reparations Act (MVRA). When it became effective the following year, the MVRA brought about "sweeping changes in the realm of automobile insurance" which "transformed Kentucky into a no-fault state." *Samons v. Kentucky Farm Bureau Mut. Ins. Co.*, 399 S.W.3d 425, 427 (Ky. 2013). An important part of the MVRA was that it required insurance policies to contain $10,000 of basic reparation benefits (BRB) or personal injury protection (PIP)[1] which was paid from the insured driver's policy regardless of fault.[2]

---

[1] "Courts have long-held that it is acceptable to use BRBs and PIP interchangeably." *Samons*, 399 S.W.3d at 428, n.7.

[2] Kentucky Revised Statutes (KRS) 304.39-020(2); KRS 304.39-030(1).

While $10,000 could provide generous benefits in 1975, to keep up with inflation the amount of PIP benefits now would need to be about six times higher to have equivalent purchasing power.[3] Even worse, increases in health care costs have exceeded simple inflation.[4]

All of this leads to the inexorable conclusion that since the General Assembly has not increased the mandatory amount of PIP benefits in the intervening time,[5] PIP benefits can be quickly exhausted from even relatively minor accidents, and insureds are under tremendous pressure to carefully allocate what benefits they have, to receive the most "bang for their buck."

KRS 304.39-241 empowers covered persons to "direct the payment of benefits among the different elements of loss[.]" This appeal concerns whether insureds who elect to exercise their statutory right to control how these PIP benefits are paid out pursuant to KRS 304.39-241, can then specify which healthcare providers get paid first out of the limited fund of PIP benefits. The

---

[3] According to the *Inflation Tool: Calculator*, the inflation rate in the United States between 1975 and today totals 488.02%, and $10,000 in 1975 was equivalent to $58,288.42 in 2024. https://www.inflationtool.com/us-dollar/1975-to-present-value (last visited Feb. 3, 2025).

[4] *See* Lekhnath Chalise, *How have Healthcare Expenditures Changed? Evidence from the Consumer Expenditure Surveys*, Beyond the Numbers, Nov. 2020, U.S. Bureau for Labor Statistics, https://www.bls.gov/opub/btn/volume-9/how-have-healthcare-expenditures-changed-evidence-from-the-consumer-expenditure-surveys.htm.

[5] We do not fault the General Assembly for failing to take such an action. These are complex issues and other states have failed to adopt "no-fault" coverage or repealed it due to problems which have arisen after the implementations of such coverage, and even most states which have kept PIP benefits have not increased the amount of coverage. *See generally*, Trevor M. Gordon, *To Reform or Repudiate? An Argument on the Future of No-Fault Auto Insurance*, 17 Quinnipiac Health L.J. 63 (2014); Nora Freeman Engstrom, *An Alternative Explanation for No-Fault's "Demise"*, 61 DePaul L. Rev. 303 (2012).

resolution to this issue depends upon the meaning to be given to the phrase "elements of loss" and the purposes for which mandatory no-fault insurance was created.

Megan Johnson purchased an insurance policy from Erie Insurance Exchange (Erie); the policy contained the statutorily mandated PIP coverage. Johnson and her passenger Terri Reed (the insureds) were involved in a motor vehicle accident. Their attorney submitted a written request that Erie withhold tendering payment to their initial healthcare providers as the insureds were exercising their rights pursuant to KRS 304.39-2421. Their attorney later directed Erie to follow the insureds' directions in distributing their PIP benefits to their chiropractor.

Erie refused, stating that it had to pay requests for medical expense reimbursement in the order in which they were submitted, because all medical bills fell under "one element of loss" based on the definition of "loss" contained in KRS 304.39-020(5) which also defines five categories of loss in subparts (a)-(e), one of which is "medical expense."

The Floyd Circuit Court disagreed, granting summary judgment to the insureds and awarding extra interest and attorney fees because Erie failed to follow the insureds' direction. Erie appealed and the Court of Appeals affirmed.

Having considered the legislative intent behind the relevant statutes, we rule that Erie should have followed the insureds' directives. Therefore, we affirm the grant of summary judgment on this issue and the award of statutory interest for the delayed payment of benefits.

However, we reverse the awards to the insureds of excess interest and attorney fees. These awards are not justified because Erie acted appropriately in filing a declaration of rights action and requesting interpleader on this novel issue.

## I. FACTUAL AND LEGAL BACKGROUND

On October 14, 2018, the insureds were involved in a vehicular accident in Johnson's car. They sought medical treatment the next day, and the hospital, radiologist, and osteopath submitted bills and records to Erie for payment under the BRB coverage. The insureds later sought chiropractic treatment, and the chiropractor also submitted bills and records to Erie.

The insureds promptly requested no-fault benefits and their counsel sent the PIP applications to Erie along with a letter of representation and instructed Erie to withhold all no-fault benefit payments until further instruction. Erie complied.

A few months later, counsel requested that Erie make PIP payments *only* to the insureds' chiropractor. Erie refused, arguing that it would pay the medical bills in the order in which they "accrued" on a "first-in, first-out basis."

The insureds' attorney disagreed with Erie's interpretation of KRS 304.39-241 and informed Erie that if it did not pay the insureds' medical bills in the order they preferred, they would file suit and request PIP benefits, attorney fees, and costs. Further discussions did not result in any agreement.

On January 25, 2019, Erie filed a declaratory judgment action, explaining in its pleading its contention that while KRS 304.39-241 permits an

4

injured party to direct or allocate PIP benefits between or among the elements of loss, the MVRA does not permit an injured party to direct payment within an element of loss. In the heading of its pleading, Erie also indicated that it intended to file interpleader.

On February 15, 2019, the insureds filed an answer and counterclaim regarding Erie's failure to follow their directive and sought excess interest on overdue payments and an award of attorney fees pursuant to KRS 304.39-210 and KRS 304.39-220.[6]

On April 11, 2019, Erie simultaneously filed a motion for summary judgment and a motion for interpleader. On June 4, 2019, the trial court denied both motions.

On June 14, 2019, the insureds filed their own motion for summary judgment.

On August 22, 2019, a new order was entered which amended the trial court's June 4, 2019, order. The trial court reiterated its denial of Erie's motion for summary judgment, ruled Erie was responsible for the payment of the insureds' medical bills in accordance with their directives, and finalized its previous orders. Another order, entered August 22, 2019, stated that the trial court "will award attorney's fees[.]" On September 20, 2019, an order was entered awarding attorney Hall $14,383 in attorney fees.

---

[6] Initially, the appellees also sought extra-contractual damages for bad faith but later voluntarily dismissed this count.

5

On September 20, 2019, Erie appealed. The Court of Appeals affirmed the trial court's rulings. *Erie Insurance Exchange v. Johnson*, 2019-CA-1449-MR, 2021 WL 1823283, at *6 (Ky. App. May 7, 2021) (*Erie I*) (unpublished). In its opinion, the Court of Appeals determined it was appropriate for the insureds to be allowed to designate the order of payment within an element of loss. *Id.* at *4. The Court of Appeals also upheld the granting of attorney fees and excess interest, even though it noted irregularities with the relevant orders, determining it was sufficient that it was established that the denial or delay in payment was without reasonable foundation. *Id.* at *5.

Erie sought discretionary review from our Court which we granted. We vacated the Court of Appeals' opinion and dismissed the appeal for lack of subject jurisdiction over non-final and non-appealable orders. *Erie Insurance Exchange v. Johnson*, 647 S.W.3d 198, 204 (Ky. 2022) (*Erie II*). We noted that in awarding attorney fees the trial court applied KRS 304.39-220(1) when it should have applied KRS 304.39-220(2) because the action was brought by the reparation obligor. *Erie II*, 647 S.W.3d at 203. In our conclusion we commented that the issue raised, which could not appropriately be addressed on the merits at that juncture, "affects potentially millions of Kentuckians, and yet is an issue of first impression." *Id.* at 204.

On remand, on November 16, 2022, a final judgment was entered which granted summary judgment to the insureds and their attorney and denied summary judgment to Erie. The trial court concluded:

6

Johnson and Reed may direct the payment of benefits "among" the different elements of loss, i.e., "medical expense" and "work loss," in writing. Johnson and Reed may also direct payment "within" an element of loss, i.e., "medical expense," in writing. Therefore, Erie must honor the written direction of benefits provided by Johnson and Reed on a prospective basis. KRS 304.39-241.

The trial court ruled that after Erie received the insureds' PIP payment directive to pay the chiropractor bills that had accrued as of January 16, 2019, Erie had a statutory duty to make such payments and such payments were overdue. This entitled the insureds to the statutorily mandated 12% interest pursuant to KRS 304.39-210(2).

The trial court further found as a matter of law that "Erie's refusal to follow Johnson's and Reed's PIP payment directive was without reasonable foundation under KRS 304.39-210(2) and Johnson and Reed are entitled to recover 'excess interest' on overdue payments at the rate of eighteen percent (18%) per annum." Finally, the trial court awarded attorney fees under one or both sections of KRS 304.39-220 because "(1) Erie's denial or delay in making payments was without reasonable foundation, and (2) because Johnson and Reed are successful litigants in an action originated by Erie." This resulted in attorney fees totaling $51,048.

Erie appealed and the Court of Appeals affirmed, ruling "KRS 304.39-241 effectively allows insureds to direct payments within an element of loss." *Erie Insurance Exchange v. Johnson*, 2022-CA-1405-MR, 2023 WL 8656205, at *6 (Ky. App. Dec. 15, 2023) (*Erie III*) (unpublished). The Court of Appeals also concluded that the trial court did not abuse its discretion in awarding attorney fees and increased interest because Erie's good faith was irrelevant. *Id.* at *7.

7

While acknowledging that the interpretation of KRS 304.39-210(1) and 304.39-241 was a matter of first impression, the Court of Appeals agreed with the trial court "that Erie's position was clearly contrary to the language of the statutes and the policies behind the MVRA." *Erie III*, 2023 WL 8656205, at *6.

We granted discretionary review and set the matter for oral argument. We also granted motions for the filing of *amicus curiae* briefs by the Insurance Institute of Kentucky, the Kentucky Defense Counsel, Inc., the Kentucky Hospital Association, and the Kentucky Justice Association.

## II. STANDARD OF REVIEW

As resolution of what "elements of loss" means depends solely on the statutory interpretation of the meaning, impact, and interrelation of statutes within the MVRA, we review the trial court's decision *de novo*.[7] *Mr. Roof of Louisville, LLC v. Estate of Henry*, 681 S.W.3d 115, 121 (Ky. 2023). Accordingly, the trial court's and the Court of Appeals' interpretation of these statutes is not entitled to any deference. *Cumberland Valley Contractors, Inc. v. Bell Cnty. Coal Corp.*, 238 S.W.3d 644, 647 (Ky. 2007).

As to whether the award of attorney fees and increased interest was appropriate, we review such awards for abuse of discretion. *Erie II*, 647 S.W.3d at 203. *See generally Officeware v. Jackson*, 247 S.W.3d 887, 891–92 (Ky. 2008).

---

[7] This is of course the regular standard of review for a grant of summary judgment as well, as it is a question of law. *Dolt, Thompson, Shepherd & Conway, P.S.C. v. Commonwealth ex rel. Landrum*, 607 S.W.3d 683, 686 (Ky. 2020).

## III. ANALYSIS

Erie requests that we reverse the Court of Appeals and the trial court by ruling that summary judgment was improperly granted because: (1) the MVRA, requires insurers to pay PIP benefits "as loss accrues" and does not require insurers to pay particular providers in the order that an insured requests within an element of loss; and (2) Erie had a reasonable foundation for delaying PIP payments because the plain meaning of the statute is a question of law which is a matter of first impression, arguing therefore that even if Erie was incorrect in its interpretation, it should not have to pay extraordinary interest or attorney fees.

### A. Statutory Interpretation

When we engage in statutory interpretation, it is our goal and duty to carry out the intent of the legislature. *Mr. Roof of Louisville, LLC*, 681 S.W.3d at 121; *Commonwealth v. Plowman*, 86 S.W.3d 47, 49 (Ky. 2002). This is in accordance with the relevant portion of KRS 446.080(1): "All statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature[.]"

"This Court has repeatedly held that statutes must be given a literal interpretation unless they are ambiguous and if the words are not ambiguous, no statutory construction is required." *Plowman*, 86 S.W.3d at 49. "In other words, we assume that the '[Legislature] meant exactly what it said, and said exactly what it meant.'" *Revenue Cabinet v, O'Daniel*, 153 S.W.3d 815, 819 (Ky.

2005) (quoting *Stone v. Pryor*, 103 Ky. 645, 45 S.W. 1136, 1142 (1898) (Waddle, S.J., dissenting)).

When particular words need interpretation, we should look to "the common meaning of the particular words chosen, which meaning is often determined by reference to dictionary definitions." *Jefferson Cnty. Bd. of Educ. v. Fell*, 391 S.W.3d 713, 719 (Ky. 2012). This is in accordance with KRS 446.080(4), which states: "All words and phrases shall be construed according to the common and approved usage of language, but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed according to such meaning." We recognize, however, that dictionary definitions are not necessarily conclusive and legislative intent reigns supreme. *Plowman*, 86 S.W.3d 47, 49 (Ky. 2002).

Sometimes a review of the words in a statute will reveal a latent ambiguity, in which a particular word or words is subject to more than one reasonable interpretation. *See MPM Financial Group, Inc. v. Morton*, 289 S.W.2d 193, 197-98 (Ky. 2009). In such a situation, "we must consider all of the relevant accompanying facts, circumstances, and laws, including time-honored cannons of construction[.]" *Fox v. Grayson*, 317 S.W.3d 1, 8 (Ky. 2010). This may include considering the general purpose of the statute. *Barnett v. Central Kentucky Hauling, LLC*, 617 S.W.3d 339, 343 (Ky. 2021).

We have repeatedly stated that we "must not be guided by a single sentence of a statute but must look to the provisions of the whole statute and its object and policy." *Samons*, 399 S.W.3d at 429 (quoting *Cosby v.*

10

*Commonwealth,* 147 S.W.3d 56, 59 (Ky. 2004)). A particular word, sentence or subsection under review should not be viewed in a vacuum. *Fell,* 391 S.W.3d at 719. Instead, the entire statute should be considered "in context with other parts of the law" with any key language interpreted by considering the whole act in which it appears. *Petitioner F v. Brown,* 306 S.W.3d 80, 85–86 (Ky. 2010).

Ultimately, "the intent of the General Assembly 'shall be effectuated, even at the expense of the letter of the law.'" *Samons,* 399 S.W.3d at 429 (quoting *Commonwealth v. Rosenfield Bros. & Co.,* 118 Ky. 374, 80 S.W. 1178, 1180 (1904)).

**B. Resolving What "Elements of Loss" Means**

Erie's first argument is that an insured cannot designate which providers are paid first within the category of "medical expense" because such category constitutes one "element of loss" and an insured can only designate which category is paid first, not how payments within such a category are paid. Erie relies on too narrow of an interpretation of three statutes (KRS 304.39-210(1), KRS 304.39-241, and KRS 304.39-020(2) and (5)), rather than considering how and when they were enacted and amended.

KRS 304.39.210(1) provides in relevant part:

Basic and added reparation benefits are payable monthly as loss accrues. Loss accrues not when injury occurs, but as work loss, replacement services loss, or medical expense is incurred. Benefits are overdue if not paid within thirty (30) days after the reparation obligor[8] receives reasonable proof of the fact and amount of loss

---

[8] "Reparation obligor" as defined in KRS 304.39-020(13) "means an insurer, self-insurer, or obligated government providing basic or added reparation benefits under this subtitle."

realized. . . . Notwithstanding any provision of this chapter to the contrary, benefits are not overdue if a reparation obligor has not made payment to a provider of services due to the request of a secured person when the secured person is directing the payment of benefits among the different *elements of loss*. . . . Medical expense benefits may be paid by the reparation obligor directly to persons supplying products, services, or accommodations to the claimant, if the claimant so designates.

(Emphasis added).

KRS 304.39-241 provides:

An insured may direct the payment of benefits among the different *elements of loss*, if the direction is provided in writing to the reparation obligor. A reparation obligor shall honor the written direction of benefits provided by an insured on a prospective basis. The insured may also explicitly direct the payment of benefits for related medical expenses already paid arising from a covered loss to reimburse:

(1) A health benefit plan as defined by KRS 304.17A-005(22);

(2) A limited health service benefit plan as defined by KRS 304.17C-010;

(3) Medicaid;

(4) Medicare; or

(5) A Medicare supplement provider.

(Emphasis added).

There is no specific definition provided in the MVRA for "element" or "elements of loss." The definition in KRS 304.39-020(2) for "basic reparation benefits" does, however, reference this term in its final sentence.

"Basic reparation benefits" mean benefits providing reimbursement for net loss suffered through injury arising out of the operation, maintenance, or use of a motor vehicle, subject, where applicable, to the limits, deductibles, exclusions, disqualifications, and other conditions provided in this subtitle. The maximum amount of basic reparation benefits payable for all economic loss resulting from

12

injury to any one (1) person as the result of one (1) accident shall be ten thousand dollars ($10,000), regardless of the number of persons entitled to such benefits or the number of providers of security obligated to pay such benefits. *Basic reparation benefits consist of one (1) or more of the elements defined as "loss."*

(Emphasis added).

KRS 304.39-020(5) defines "loss" as follows:

"Loss" means accrued economic loss consisting only of medical expense, work loss, replacement services loss, and, if injury causes death, survivor's economic loss and survivor's replacement services loss. Noneconomic detriment is not loss. However, economic loss is loss although caused by pain and suffering or physical impairment.

The statute then proceeds to provide additional definitions in its subparts for (a) "medical expense," (b) "work loss," (c) "replacement services loss," (d) "survivor's economic loss," and (e) "survivor's replacement services loss."

Neither the definition for "basic reparation benefits" nor the definition for "loss" provides any basis for determining whether each element of loss is solely one of these five named categories, or whether elements of loss can also include individual costs/payments within each category of loss under this definition. For example, the definition for "medical expense" listed in KRS 304.39-020(5)(a) provides a broad list of what type of expenses are covered as "loss" under that umbrella term and includes charges for ambulance services, medical care, and funeral expense.[9] We must resolve whether a single category as a whole should

---

[9] "Medical expense" means reasonable charges incurred for reasonably needed products, services, and accommodations, including those for medical care, physical rehabilitation, rehabilitative occupational training, licensed ambulance services, and other remedial treatment and care. "Medical expense" may include non-medical remedial treatment rendered in accordance with a recognized religious method of healing. The term

13

be considered an "element of loss" or whether different bills for different expenses which fall under this umbrella should also be considered an element of loss.

Since there is ambiguity regarding what the word "element" covers, it is appropriate to consider the ordinary definition of "element."[10] Merriam-Webster's pertinent definitions define element as "a constituent part: such as . . . a distinct group within a larger group or community"; the Cambridge Dictionary defines it as "a *part* of something"; and Dictionary.com defines it as "a component or constituent of a whole or one of the parts into which a whole may be resolved by analysis[.]"[11]

These definitions for "element" do not clarify the issue since as "a part of the loss" could be the categories set out in KRS 304.39-020(5), or the specific charges incurred to receive reasonable services. To resolve this latent ambiguity, it is appropriate to examine 1998 Kentucky Laws 200 (HB 493).

_____

includes a total charge not in excess of one thousand dollars ($1,000) per person for expenses in any way related to funeral, cremation, and burial. It does not include that portion of a charge for a room in a hospital, clinic, convalescent or nursing home, or any other institution engaged in providing nursing care and related services, in excess of a reasonable and customary charge for semi-private accommodations, unless intensive care is medically required. Medical expense shall include all healing arts professions licensed by the Commonwealth of Kentucky. There shall be a presumption that any medical bill submitted is reasonable.

[10] There are of course many different definitions of "element" within each source, *e.g.*, element on a periodic table, but these are the definitions of "element" that make logical sense considering the statutory language.

[11] *Element* 2.c., Merriam-Webster, https://www.merriam-webster.com /dictionary/element; *Element* 1.c., Cambridge Dictionary, https://dictionary. cambridge.org/us/dictionary/english/element; *Element* A.1., dictionary.com, https://www.dictionary.com/browse/element (all last visited Jan. 10, 2025).

14

HB 493 consisted of four sections which made significant changes to the MVRA. Among these changes was how it "married" the "elements of loss" language to an insured's right to "direct payment of benefits among such elements of loss[.]" Considering all the changes made to the MVRA by HB 493 clarifies the General Assembly's intent in making the more specific changes at issue here.

Section 1 of HB 493 created KRS 304.39-245, which provides:

A reparation obligor may request or negotiate a reduction or modification of charges from a provider of services to a secured person. In no event shall a provider of services which agrees to a reduction or modification of the charges bill the secured person for the amount of the reduction or modification. Nothing in this section is intended to prohibit a provider of services from billing charges to a secured party if the charges are not paid by a reparation obligor because the reparation benefits have been exhausted.

KRS 304.39-245 has never been amended.

Section 2 amended KRS 304.39-210(1) to add the language: "Notwithstanding any provision of this chapter to the contrary, benefits are not overdue if a reparation obligor has not made payment to a provider of services due to the request of a secured person when the secured person is directing the payment of benefits among the different elements of loss."

Section 2 also took the preexisting sentence "[m]edical expense benefits may be paid by the reparation obligor directly to persons supplying products, services, or accommodations to the claimant[,]" and added to the end of it the phrase "*if the claimant so designates.*" (Emphasis added).

15

Section 3 created KRS 304.39-241, which at that time stated as follows: "An insured may direct the payment of benefits among the different elements of loss, if the direction is provided in writing to the reparation obligor. A reparation obligor shall honor the written direction of benefits provided by an insured on a prospective basis."[12]

Section 4 repealed KRS 304.39-240 which concerned the assignment of benefits. Prior to HB 493 going into effect on July 15, 1998, KRS 304.39-240 provided:

> An assignment of or agreement to assign any right to benefits under this subtitle for loss accruing in the future is unenforceable except as to benefits for:
>
> (1) Work loss to secure payment of alimony, maintenance, or child support; or
>
> (2) Medical expense to the extend the benefits are for the cost of products, services, or accommodations provided or to be provided by the assignee.

KRS 304.39-240 (1996) (repealed by HB 493).

In considering HB 493 as a whole, the legislative intent becomes clear. The General Assembly was empowering insureds/secured persons or reparation obligors to negotiate the amount to be paid on beneficiaries' particular healthcare bills. KRS 304.39-245. To facilitate such negotiations, insureds/secured persons had to be able to direct the reparation obligor *not* to make payments to the providers of service, except at their direction. KRS

---

[12] KRS 304.39-241 was amended in 2012, to its present form, set out *supra.* 2012 Kentucky Laws Ch. 41 (HB 42). This permitted the insured to direct payments to reimburse health insurance for paid medical expenses.

304.39-241. Insurance companies were, accordingly, exempt from any penalties for making late payments *if* they were following their insureds'/secured persons' directives regarding the payment of benefits among the different elements of loss. KRS 304.39-210(1).

Finally, with the repeal of KRS 304.39-240, medical providers were prohibited from receiving an assignment of PIP benefits which had allowed them to be paid the list prices of their services, rather than the reasonable cost of their services after negotiation. In *Neurodiagnostics, Inc. v. Kentucky Farm Bureau Mut. Ins. Co.*, 250 S.W.3d 321, 327 (Ky. 2008), we explained that by repealing KRS 304.39.240 and replacing it with KRS 304.39-241,

> the legislature recognized that it is a more efficient, economical, and equitable system to keep the provider out of the reparations process and afford the insured the control of how his or her benefits are paid because there is only a certain amount of money available for payment. If each and every medical provider obtained an assignment—as a matter of course—of any right to benefits under the MVRA, the insured's benefits could be exhausted after an accident[.]

We clarify our use of the term insured/secured person in the above explanation. KRS 304.39-210(1) refers to "a secured person" and KRS 304.39-241 refers to "an insured." KRS 304.39-070(1), defines a "secured person" as being "the owner, operator or occupant of a secured motor vehicle[.]" As explained in *Schmidt v. Leppert*, 214 S.W.3d 309, 312 (Ky. 2007), "in order to have 'security' on a motor vehicle, an insured's policy must include BRB." KRS 304.39-020(3)(a) defines "basic reparation insured" as being "[a] person identified by name as an insured in a contract of basic reparation insurance complying with this subtitle[.]" Therefore, generally, a "secured" person will be

17

synonymous with "an insured" and the occupants of the insured's vehicle. While KRS 304.39-245 does not mention insureds/secured persons negotiating, they are of course the ones who have an interest in getting as many bills paid as possible out of the BRB limits. In contrast, once it is established that the BRB limits will be exceeded, the reparation obligor (their insurance company), has no specific interest in negotiating how the $10,000 PIP benefits are allocated.

Negotiations to reduce payments to health care providers as provided for in KRS 304.39-245 could not be effective if "elements of loss" referred solely to the different categories of loss defined in KRS 304.39-020(5)(a)-(e) and obligated insurance companies to pay healthcare providers on a first-in, first-out basis once it was apparent that the secured persons did not have any other categories of loss. Yet, this is exactly what Erie argues it is mandated to do.

The mandatory $10,000 of PIP benefits provided for in KRS 304.39-020(2) could be exhausted within minutes of arriving at the hospital if the listed prices for services were simply paid out, resulting in injured persons having difficulty accessing appropriate healthcare after that time. However, providers will often take pennies on the dollar to ensure that they receive some payment rather than try to collect directly from an insured who may have no funds or health insurance. For example, in *Hughes and Coleman, PLLC v. Chambers*, 526 S.W.3d 70, 72 (Ky. 2017), counsel was able to negotiate a hospital bill totaling $71,812.40 down to a negotiated full-satisfaction payment of $3,492.88 which counsel paid out of escrowed PIP funds.

18

Additionally, such an interpretation furthers the MVRA's general purposes as set out in its provisions and in our previous interpretations. KRS 304.39-010 provides the general purposes of the MVRA, which includes:

> (2) To provide prompt payment to victims of motor vehicle accidents without regard to whose negligence caused the accident in order to eliminate the inequities which fault-determination has created;
>
> (3) To encourage prompt medical treatment and rehabilitation of the motor vehicle accident victim by providing for prompt payment of needed medical care and rehabilitation;
> . . .
>
> (6) To help guarantee the continued availability of motor vehicle insurance at reasonable prices by a more efficient, economical and equitable system of motor vehicle accident reparations[.]

The adoption of the MVRA "reflected a policy 'for prompt and liberal recovery to accident victims without regard to fault.'" *Samons*, 399 S.W.3d at 427 (quoting Robert P. Moore & David W. Rutledge, Note, *Kentucky No–Fault: An Analysis and Interpretation,* 65 Ky. L.J. 466, 473-74 (1976–77)).

In interpreting provisions of the MVRA, we should keep in mind that it constitutes "remedial legislation and should be interpreted broadly." *Samons*, 399 S.W.3d at 430. "[T]he basic rule of statutory construction [is] that the 'MVRA is to be liberally interpreted in favor of the accident victim.'" *Fields v. BellSouth Telecommunications, Inc.*, 91 S.W.3d 571, 572 (Ky. 2002) (quoting *Lawson v. Helton Sanitation, Inc.*, 34 S.W.3d 52, 62 (Ky. 2000) (Wintersheimer, J., dissenting)). *See Crenshaw v. Weinberg*, 805 S.W.2d 129, 131 (Ky. 1991). The "significant changes" contained in the MVRA "were aimed at a specific objective: to insure continuous liability insurance coverage in order to protect

19

the *victims* of motor vehicle accidents and to insure that one who suffers a loss as the result of an automobile accident would have a source and means of recovery." *National Ins. Ass'n v. Peach*, 926 S.W.2d 859, 861 (Ky. App. 1996).

By allowing the insureds to control and direct the payment of their medical bills, they can get needed medical care and rehabilitation promptly and without delay. Limiting insureds' ability to choose only the category of which loss will be paid may, instead, result in the delay of their physical recovery by blocking their access to needed medical care. The insureds, who properly complied with the law by purchasing appropriate first party coverage, receive the benefit of their bargain when they can direct how these limited funds are allocated in the method which best suits their needs.

Here, these insureds have determined that being able to obtain chiropractic services was a priority in their treatment and rehabilitation; this decision should be respected. As was argued by the insureds during oral argument, another insured might feel that a surgery was warranted, yet such surgery might be impossible to obtain without the availability of retained PIP funds.

We conclude that the trial court and the Court of Appeals correctly ruled that Erie should have allowed the insureds to designate the order in which Erie paid their medical bills. We disagree, however, with our lower courts' conclusion that this is appropriate because KRS 304.39-241 allows insureds to direct payments *within* an element of loss in contravention of the clear statutory language of KRS 304.39-210 and KRS 304.39-241 which permits a

20

secured person to "direct[13] the payment of benefits *among* the different elements of loss." (Emphasis added). We properly conform our ruling to the statutory language by interpreting "elements of loss" as both including the five categories of "loss" set out in KRS 304.39-020(5)(a)-(e), *and* any bills/costs that come within those categories. This is simply a sensible conclusion in light of the purposes of the MVRA, which gives effect to the statutory language. *Samons*, 399 S.W.3d at 430.

We depart from the misleading *dicta* contained in *Neurodiagnostics, Inc.*, which implied that the phrase "elements of loss" was synonymous with the five categories of loss set out under KRS 304.39-020(5).[14] A definition for "elements of loss" was not required for our holding that medical providers have no standing to bring a direct action against the reparation obligor for BRB under the MVRA. *Neurodiagnostics, Inc.*, 250 S.W.3d at 329.

**C. Entitlement to Extra Interest and Attorney Fees**

In *Erie II*, which was decided some six years after *Neurodiagnostics, Inc.*, we specifically noted that how we should define "elements of loss" was "an issue of first impression." *Erie II*, 647 S.W.3d at 204. There would have been no

---

[13] KRS 304.39-241 uses "direct" while KRS 304.39-210 uses "is directing"; otherwise, the language in these two statutes is identical.

[14] We stated in a footnote "[u]nder KRS 304.39–020(5), as applied to this case, the elements of accrued economic loss are medical expenses and work loss." *Neurodiagnostics, Inc.*, 250 S.W.3d at 323 n.2. Later, in providing the practical reasons why KRS 304.39-240 was repealed and replaced with KRS 304.39-241, we stated it would be problematic to allow medical providers to obtain an assignment of benefits because that would rapidly exhaust the insured's PIP benefits, "leaving the insured no ability to decide at a later date that he or she would be better served by directing reparation benefits to cover some other element of loss such as [work] loss." *Neurodiagnostics, Inc.*, 250 S.W.3d at 327.

21

need to resolve this issue then or now, or to have four *amicus curiae* briefs submitted for our consideration if *Neurodiagnostics, Inc.* had already definitively resolved the matter. This bears on our resolution of the remaining issues.

We review the relevant statutes to determine whether the trial court abused its discretion in awarding extra interest on the overdue payments and attorney fees.

As to interest, KRS 304.39-210(1) provides in relevant part that "[b]enefits are overdue if not paid within thirty (30) days after the reparation obligor receives reasonable proof of the fact and amount of loss realized[.]" KRS 304.39-210(2) states: "Overdue payments bear interest at the rate of twelve percent (12%) per annum, except that if delay was without reasonable foundation the rate of interest shall be eighteen percent (18%) per annum."

While Erie received direction from the insureds as to how the healthcare bills needed to be paid, it failed to pay the chiropractor's bills within a timely matter, and apparently did not pay any bills during the course of this litigation. Therefore, these payments are overdue. However, as should be obvious from our discussion *supra*, Erie's delay was not "without reasonable foundation" as it was an open question as to how "elements of loss" should be interpreted, and the *dicta* from *Neurodiagnostics, Inc.* provided Erie with a legitimate reason for not following the insureds' directions. Erie failed to make timely payments based on its reasonable interpretation of an unsettled area of the law and attempted to do what the statutes required.

22

Moreover, Erie acted reasonably by filing a declaratory judgment action to clarify this matter. Our analysis is not changed by the fact that the case was ultimately decided against Erie. *Automobile Club Ins. Co. v. Lainhart*, 609 S.W.2d 692, 695 (Ky. App. 1980). Erie also acted reasonably in filing a motion for interpleader to pay the PIP funds to the court. Although the trial court was correct to determine that the statutorily mandated interest is due, the trial court abused its discretion in requiring the 18% interest rate per annum. Therefore, we reverse the award of 18% interest, but affirm the award of interest at the regular overdue rate of 12%.

As to attorney fees, KRS 304.39-220(2) provides: "In any action brought against the insured by the reparation obligor, the court may award the insured's attorney a reasonable attorney's fee for defending the action." Regarding attorney fees, the trial court's order appears to question our conclusion in *Erie II* that only KRS 304.39-220(2) applies to the award of attorney fees by making rulings that attorney fees were appropriate pursuant to KRS 304.39-220(1) and (2). We will treat our previous pronouncement as the law of the case for purposes of this litigation, without resolving whether law of the case applies generally in such a situation. That issue is not truly before us as the parties have not argued about whether law of the case should apply.

A decision to award attorney fees pursuant to KRS 304.39-220(2) is discretionary due to the "may" language. We conclude that the trial court abused its discretion in awarding attorney fees in this situation where the law was unsettled and Erie was acting in good faith to file a declaratory judgment

23

action where the insureds stated they would be taking legal action if Erie did not follow their directions, Erie asked to have the trial court resolve the dispute, and Erie attempted to have the trial court accept interpleader, which the trial court refused. Undoubtedly, litigating this action has been quite expensive for both parties, but an award of fees is not justified under the circumstances.

### III. CONCLUSION

Accordingly, we affirm the Court of Appeals in part, reverse in part, and remand for proceedings consistent with this opinion. We affirm the Court of Appeals' decision that Erie must pay the insureds' healthcare providers' bills in the order they designated. We affirm statutory interest at 12% but reverse the award of interest above that rate. We also reverse the award of attorney fees.

LAMBERT, C.J.; Bisig, Conley, Keller, Nickell, and Thompson, JJ., sitting. Lambert, C.J.; and Conley, J., concur. Bisig, J., concurs in result only. Nickell, J., concurs in part, dissents in part by separate opinion in which Keller, J., joins. Goodwine, J., not sitting.

NICKELL, J., CONCURRING IN PART AND DISSENTING IN PART: I agree with the reasoning of the majority relative to excess interest and attorney's fees having been improperly awarded. However, I respectfully dissent in part regarding the primary issue presented on appeal.

This case essentially involves an issue of statutory construction. "The cardinal rule of statutory construction is that the intention of the legislature should be ascertained and given effect." *Cabinet for Human Res., Interim Office*

24

*of Health Planning & Certification v. Jewish Hosp. Healthcare Servs., Inc.,* 932 S.W.2d 388, 390 (Ky. App. 1996).

I diverge from the majority's holding which purports to divine a more "sensible" definition for the MVRA's phrase "elements of loss." In reality, the majority's inflated exegesis of the statute's plain language stretches its meaning far beyond its clearly intended reach, bolstered largely by the majority's own policy preferences supported by nothing more than bald assertions.

Public policy derives from "the Constitution and statutes and the decisions of the courts of last resort of a state[.]" *Lewis by Lewis v. West American Ins. Co.,* 927 S.W.2d 829, 835-36 (Ky. 1996) (quoting *City of Princeton v. Princeton Elec. Light & Power Co.,* 166 Ky. 730, 179 S.W. 1074, 1078 (1915)). Declarations of public policy are "not simply something courts establish from general considerations of supposed public interest, but rather something that must be found *clearly expressed in the applicable law.*" *State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick,* 413 S.W.3d 875, 881 (Ky. 2013) (emphasis added).

While the majority's stated policy reasons may be compelling to some, they are not expressed in the MVRA and in accordance with our caselaw may not serve as a legitimate foundation upon which to judicially construct a statutory intent contrary to that clearly expressed by plain legislative language. Yet that is precisely what the majority's opinion does.

In Kentucky, every person suffering a loss because of use of a motor vehicle has the right to BRB coverage, unless the person has rejected the

25

limitation upon his or her tort right as provided in KRS 304.39-060(4). KRS 304.39-030. BRB payments are made "without regard to fault." KRS 304.39-040(1). The purpose of BRB is to cover the most pressing and necessary needs of an injured party. Kentucky's MVRA defines BRB as:

> benefits providing reimbursement for net loss suffered through injury arising out of the operation, maintenance, or use of a motor vehicle, subject, where applicable, to the limits, deductibles, exclusions, disqualifications, and other conditions provided in this subtitle. The maximum amount of basic reparation benefits payable for all economic loss resulting from injury to any one (1) person as the result of one (1) accident shall be ten thousand dollars ($10,000), regardless of the number of persons entitled to such benefits or the number of providers of security obligated to pay such benefits. *Basic reparation benefits consist of one (1) or more of the elements defined as "loss."*

KRS 304.39-020(2) (emphasis added).

"Loss" is defined by the MVRA as an "accrued economic loss *consisting only of* medical expense, work loss, replacement services loss, and, if injury causes death, survivor's economic loss and survivor's replacement services loss." KRS 304.39-020(5) (emphasis added). The MVRA then further defines "medical expense" as "reasonable charges incurred for reasonably needed products, services, and accommodations, including those for medical care, physical rehabilitation, rehabilitative occupational training, licensed ambulance services, and other remedial treatment and care." KRS 304.39-020(5)(a).[15]

---

[15] KRS 304.39-020(5)(b)-(e) similarly provide definitions for work loss, replacement services loss, survivor's economic loss, and survivor's replacement services loss. None of these types of losses are at issue in this case.

26

Thus, the plain language of KRS 304.39-020(5) clearly contemplates each medical bill or charge to be subsumed under the categorical umbrella of "medical expense" and not to be considered an element of loss in and of themselves. In the statutory framework, "element of loss" is used as a broad phrase setting forth categories of loss which, in the context of medical expenses, includes within itself the individual charges levied by various medical providers.

The MVRA provides direction and guidance regarding how and when BRB payments are to be made. Pursuant to KRS 304.39-210(1), benefits "are payable monthly as loss accrues. Loss accrues not when injury occurs, but as . . . medical expense is incurred. Benefits are overdue if not paid within thirty (30) days after the reparation obligor receives reasonable proof of the fact and amount of loss realized[.]"

However, "benefits are not overdue if a reparation obligor has not made payment to a provider of services due to the request of a secured person when the secured person is directing the payment of benefits *among* the *different* elements of loss." KRS 304.39-210(1) (emphasis added). "An insured may direct the payment of benefits *among* the *different* elements of loss, if the direction is provided in writing to the reparation obligor." KRS 304.39-241 (emphasis added). "A reparation obligor shall honor the written direction of benefits provided by an insured on a prospective basis." *Id.*

In the present appeal, the statutory authority of the insured to direct payments "among" the "different" elements of loss is uncontested. It is further

27

undisputed that the claimants notified Erie of their desire to direct payment of their benefits. The sole issue presented in this case is whether the scope of the insured's authority to govern an obligor's BRB payments is unlimited, permitting the insured to single out an individual medical provider for payment of medical services to the exclusion of all others. I conclude it is not.

A reparations obligor is required to pay BRB medical expenses on a first-in, first-out basis pursuant to the mandates of KRS 304.39-210(1), which plainly states such benefits "are payable monthly as loss accrues," which in this instance is explained to mean when "medical expenses [are] incurred." The majority, however, ignores the statute's transparent language and eviscerates its inescapable legislative intent by quixotically interpreting the statute's reference to "element of loss" to mean each incurrence of a medical expense—rather than medical expenses as a category of loss—thereby ostensibly permitting the insured, Johnson, to direct the obligor, Erie to pay only a single medical provider for providing specific medical services. Such a conclusion is both fallacious and impracticable.

First, the majority's statutory interpretation of the statutory phrase "element of loss" defies logic.

The legislatively drawn statute begins by clearly defining BRB as benefits up to a specified limited amount "providing reimbursement for net loss suffered through injury arising out of the operation, maintenance, or use of a motor vehicle," and consisting "of one (1) or more of the elements defined as 'loss.'" KRS 304.39-020(2). The statute then logically proceeds to immediately identify

28

and define only five enumerated characteristic types of "accrued economic loss" subject to such reimbursement, including (1) expenses for obtaining reasonably necessary medical care, (2) loss of income resulting from an inability to perform customary work, (3) replacement of ordinary and necessary services customarily performed by an insured for the benefit of oneself or family, (4) deprivation of certain limited income, items, or services of economic value lost by survivors due to an insured's death, and (5) costs suffered by survivors costs to replace ordinary and necessary services formerly performed by a deceased insured. KRS 304.39-020(5)(a)-(e).

In setting forth the reparation obligor's reimbursement duties, the statute alludes to an insured's statutory right to direct "the payment of benefits among the different elements of loss." KRS 304.39-210. More specifically, KRS 304.39-241 specifically establishes the limited parameters of that right, stating "[a]n insured may direct the payment of benefits among the different elements of loss."

Logically, if an insured directs a reparations obligor to pay only medical expenses to the exclusion of the other four "different" enumerated types of statutory loss, then the insured's right to direct BRB payments is at an end and the obligor's duty to sequentially pay such designated losses pursuant to statutory dictates begins. "[L]ogic, like common sense, 'must not be a stranger in the house of the law.'" *Southworth v. Commonwealth*, 435 S.W.3d 32, 45 (Ky. 2014) (quoting *Cantrell v. Kentucky Unemployment Ins. Comm'n*, 450 S.W.2d 235, 237 (Ky. 1970)).

This pragmatic reading and practical application of the statutory phrase "element of loss" harmonizes with stated legislative policies aimed at encouraging "prompt medical treatment and rehabilitation . . . by providing prompt payment," KRS 304.39-010(3); restraining "inequities and uncertainties," KRS 304.39-010(5); and fostering "continued availability of motor vehicle insurance at reasonable prices" by ensuring "a more efficient, economical and equitable system of motor vehicle accident reparations," KRS 304.39-010(6). Moreover, this rational and equitable statutory interpretation is contrary to the majority's errant overbroad apprehension of "element of loss" which would untenably expand an insured's statutory right to include the arbitrary and solipsistic culling or cherry-picking of favored medical providers for reimbursement to the exclusion of other similarly-situated medical providers possessing an equivalent rightful expectation of timely reimbursement for promptly and professionally provided necessary medical and rehabilitative care and services.

Second, the majority's statutory treatment of each individual medical charge as a separate element of loss is divergent from the plain and ordinary meaning of the statutory language. Contrary to the majority's conclusion, the phrase "element of loss" is not ambiguous or reasonably susceptible to multiple interpretations. The language chosen by the legislature is clear and straightforward.

Separate medical charges billed for each distinct medical treatment, prescription, or service rendered by a medical provider are mere self-contained

30

component parts comprising the whole of the "loss" category defined as "medical expense" under KRS 304.39-020(5). There, the legislature defined "medical expense" to mean "reasonable charges incurred for reasonably needed products, services, and accommodations, including those for medical care, physical rehabilitation, rehabilitative occupational training, licensed ambulance services, and other remedial treatment and care," and specified the term included "all healing arts professions licensed by the Commonwealth of Kentucky."

Had the legislature intended to allow claimants to micromanage reparations obligors by directing reimbursement or nonpayment relative to each individual medical bill accrued, it could easily have done so. It did not. Instead, it clearly and quite simply allowed claimants to direct limited BRB payments among five broadly defined elements, or categories, of loss.

The majority holds that the statutory definition of "loss" contained in KRS 304.39-020(5) envisioned individual medical expenses, rather than medical expenses as a whole, to constitute an element of loss. Because the statute allows claimants to choose between "different" elements of loss for reimbursement by obligors, this granular perspective of medical expenses now effectively allows claimants line-item authority to direct payments or avoidance among equivalent medical charges. The majority's expansive redefining of what "element of loss" means in relation to the MVRA is not a subtle or nuanced change and drastically alters the scope of the provision.

31

In short, the majority's holding effectuates implicitly what could not have legitimately been accomplished explicitly—that is, to judicially rewrite a legislative statute. By its decision today, the majority judicially alters the statutory authority allowing claimants to direct payments "among" "different" statutorily defined elements, or types, of loss to now empower them to dictate payments "within" a single element—something it initially admits is disallowed under the statute's plain language. In reaching its "sensible conclusion," the majority ignores the statute's plain language and clear meaning, substitutes its own notion of what public policy and legislative intent should be, and guts the obvious legislative intent in reaching its own favored outcome.

One purpose of allowing an injured party to direct payments among different elements of loss is to maximize the economic impact of BRB when paid in conjunction with other insurance coverages. For example, injured claimants may obtain economic benefits by being allowed to initially present medical bills to their health insurance provider while directing payment of BRB for reimbursement of lost wages so the costs of daily living, such as rent, mortgage expenses, utilities, and groceries, can be paid.

Third and finally, in casting a grim specter of BRB being quickly exhausted following initial post-injury emergency room and hospital visits, and urging its own policy preferences, the majority evinces a misapprehension of the manner in which medical bills are paid by the reparations obligor. As discussed in *Neurodiagnostics, Inc. v. Kentucky Farm Bureau Mut. Ins. Co.*, 250 S.W.3d 321, 327-28 (Ky. 2008), following statutory changes to the MVRA in

32

1998, medical providers no longer have standing to assert claims for payment or to bring direct actions against insurers. Instead, reparations obligors must be provided with "reasonable proof of the fact and amount of loss realized," KRS 304.39-210, and may "request or negotiate a reduction or modification of charges from a provider of services to a secured person." KRS 304.39-245. Offering no support for its position, the majority dismisses these proven safeguards by suggesting reparations obligors will ignore these statutory provisions and hastily pay the face amount of submitted medical charges without regard to an insured's interest.

In stark contrast to the majority's apocalyptic prognostications, though the record is devoid of medical billings, multiple filings in the circuit court reveal the total amount of economic losses accrued in the present case never reached the $10,000 BRB limit; this, despite the two injured parties having received diagnostic radiology examinations and osteopathic treatments at McDowell ARH Hospital the day following the minor motor vehicle collision, and thereafter having received multiple therapeutic chiropractic treatments. In short, the very facts of this case cut directly against a primary concern expressed by the majority which serves as a basis for its holding.

Further, the majority offers no reason for denouncing the innocuous language contained in a footnote in *Neurodiagnostics, Inc.*, which simply indicated the elements of accrued economic loss in that case under KRS 304.39-020(5) at issue included medical expense and work loss. Instead, the

33

majority merely declares that language to be dicta.[16]  Ignoring that the majority

opinion, itself, contains extensive discussions which might likewise qualify as

dicta, it is noteworthy that even dicta may be "persuasive or entitled to respect

according to the reasoning and application or whether it was intended to lay

down a controlling principle." *Cawood v. Hensley*, 247 S.W.2d 27, 29 (Ky.

1952) (citation omitted).  In my view, whether dicta or not, *Neurodiagnostics,*

*Inc.* set forth a correct statement of the law which has never been seriously

challenged—apparently till now—and such settled propositions should not be

abandoned simply because they compel a particular result which may be

disfavored by some.

Though the majority no doubt believes it is reaching an appropriate

result in furtherance of the purposes of the MVRA, it has seemingly failed to

consider its decision's potential chilling effects.  Allowing claimants to

arbitrarily direct payment to a favored medical provider to the exclusion of

others could result in confusion and chaos within the medical and insurance

communities; provider business practices and medical care could be negatively

impacted due to BRB payments being unreasonably delayed or annulled; costs

of certain medical procedures, items, and services may be increased to cover

postponed payments and increased financial losses; and insurance premiums

---

[16] Interestingly, the majority takes no issue with another statement from the body of the opinion in *Neurodiagnostics, Inc.* which discusses exhaustion of benefits by paying medical providers first as potentially "leaving the insured no ability to decide at a later date that he or she would be better served by directing reparation benefits to cover *some other element of loss, such as economic loss.*"  250 S.W.3d at 327 (emphasis added).

could rise and policy availability and competitiveness become limited. The occurrence of any of these consequences would be antithetical to the aforementioned core purposes of the MVRA. Perhaps the majority has not viewed its decision through this lens, and is instead focused solely on permitting a single provider of medical services to be paid to the possible exclusion of all others simply because an insured feels that resolution "best suits their needs."

In my research, I have been unable to locate any other court at any level in any other jurisdiction which has given the extremely expansive reading to the phrase "element of loss" as does the majority today. At its core, today's holding countermands the intent and purpose of the MVRA. Following this anomalous decision, Kentucky will firmly become an outlier in the no-fault insurance arena. Today, the majority opinion boldly goes where no Court has gone before. I decline to join the ill-advised journey and aberrant result, and am compelled to dissent in part.

Keller, J., joins.

COUNSEL FOR APPELLANT:

Mark A. Osbourn
Bush & Osbourn, PLLC

COUNSEL FOR APPELLEE:

Shane Hall
Shane Hall Attorney at Law, PLLC

COUNSEL FOR AMICUS CURIAE,
INSURANCE INSTITUTE OF KENTUCKY:

Susan L. Maines
Casey Bailey & Maines, PLLC

COUNSEL FOR KENTUCKY DEFENSE COUNSEL, INC.:

William B. Orberson
Ryan D. Nafziger
Phillips Parker Orberson & Arnett PLC

COUNSEL FOR KENTUCKY HOSPITAL ASSOCIATION:

Wesley R. Butler
Barnett Benvenuti & Butler, PLLC

COUNSEL FOR KENTUCKY JUSTICE ASSOCIATION:

Damon B. Willis
Ewing & Willis, PLLC